**Bowen SANDERS, Barbara Sanders; George Howard; Rhodney Cantu; Joline Cantu, Plaintiffs–Appellees,**

v.

**PARKER DRILLING COMPANY, an Alaskan Corporation, Defendant–Appellant.**

**Nos. 87–4352, 88–3748.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 1989.

Decided Aug. 7, 1990.

As Amended Sept. 26, 1990.

---

Thomas M. Daniel, David T. Jones, Perkins Coie, Anchorage, Alaska, for defendant-appellant.

Lee Holen, Elizabeth Johnson, Johnson & Holen, Anchorage, Alaska, for plaintiffs-appellees.

Before REINHARDT, KOZINSKI and TROTT, Circuit Judges.

TROTT, Circuit Judge:

## SUMMARY

This case arises out of a wrongful termination dispute between Parker Drilling Company ("Parker") and Bowen Sanders, Rhodney Cantu, and George Howard ("plaintiffs"). Parker terminated plaintiffs upon concluding they smoked marijuana while working on Parker's oil rigs in violation of Parker's drug policy. After a vigor-

ously contested trial in federal district court, the jury found on a contractual claim that Parker did not have "just cause" to terminate plaintiffs.[1] Parker sought a judgment notwithstanding the verdict or, in the alternative, a new trial. Both motions were denied by the district court, and this appeal followed.

Parker argues that the district court erred in calling on the jury to decide whether plaintiffs actually smoked marijuana on the rigs. Parker's theory is that the jury should only have been asked to determine whether Parker's decision to terminate was based on a good faith belief that plaintiffs smoked marijuana on the oil rigs, not whether the allegation was actually true. Parker asserts that if it was acting in good faith, it is insulated from liability.

We hold that under the law of Alaska, the jury in deciding the contractual issue of just cause was entitled to review the evidence underlying the termination in order to determine whether plaintiffs actually smoked marijuana on Parker's oil rigs. So holding, we find sufficient evidence in the record to support the jury's conclusion that Parker did not have just cause to terminate plaintiffs, and we affirm the district court.

### FACTS

Plaintiffs worked as floor hands on Rig 191, one of several oil drilling rigs owned by Parker on Alaska's North Slope. As floor hands, plaintiffs' job was to connect ninety-foot segments of steel pipe, each weighing 1500 pounds, and place them in the drilling hole in the floor of the rig. This is demanding work. The drilling hole is often overflowing with mud, making the rig floor slick and treacherous. The work is performed at temperatures of thirty degrees below zero, using heavy tools, the lightest of which weighs 400 pounds. It is hazardous. Injuries are frequent, ranging from severed fingers and arms to death.

Parker, in the interests of safety, enforces strict discipline aboard the rigs. This includes a laudable ban on the use or possession of drugs on the rigs. The drug ban extends to the company-provided sleeping areas, but it does not address employees' drug use during their off-time, so long as they are off of the drilling site. The plaintiffs testified that they were aware of Parker's drug policy.

During a routine safety inspection of the North Slope rigs on February 22, 1983, Parker's Safety Director, John Haynes, was told by two Parker employees, Billy Reynolds and Joe Watkins, that plaintiffs were routinely smoking marijuana on the rig and during their break periods.

Haynes, immediately upon returning to Anchorage, reported these accusations to Gary McCarrell, Parker's Division Manager. Hesitant to act on what might prove to be an unfounded rumor, McCarrell asked Reynolds and Watkins to put their allegations in writing. The handwritten statements were faxed to McCarrell that evening.

Based on these statements, McCarrell suspended plaintiffs pending investigation. At the time of their suspension, plaintiffs were off the rig on their normal two-week rotation.

After confronting plaintiffs, who denied using drugs, and based on the information above, McCarrell fired the plaintiffs. The plaintiffs brought this wrongful termination action in Alaska state court, and the suit was removed to the United States District Court for the District of Alaska. At the conclusion of the trial, the jury found that Parker did not have just cause for terminating the plaintiffs.[2] This appeal followed.

### STANDARD OF REVIEW

 The standard for reviewing jury verdicts is whether they are supported by "substantial evidence," that is, such rele-

---

1. The jury concluded Parker violated an implied covenant of good faith and fair dealing in terminating the plaintiffs. We need not discuss this issue because of our conclusions as to the matter of just cause.

2. The district court found there existed an implied contract between Parker and plaintiffs whereby plaintiffs could be terminated only for just cause.

vant evidence as reasonable minds might accept as adequate to support a conclusion. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013–14 (9th Cir. 1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986)). When there is sufficient evidence before the jury on a particular issue, and if the instructions of law on the issue were correct, the jury's verdict must stand. *Transgo*, 768 F.2d at 1014. The credibility of the witnesses and the weight of the evidence are issues for the jury and are generally not subject to appellate review. *Id.* at 1024; *see also Nicholson v. Rushen*, 767 F.2d 1426, 1427 (9th Cir.1985). Where just cause for termination is required, the employer has the burden of proving that just cause existed. *Skagway City School Board v. Davis*, 543 P.2d 218, 222 (Alaska 1975), *disapproved on other grounds, Native Alaska Reclamation and Pest Control v. United Bank of Alaska*, 685 P.2d 1211 (Alaska 1984).

### ANALYSIS

■ Courts addressing whether good cause for dismissal existed generally must answer two separate questions: (1) whether the employee engaged in the conduct the employer alleges; and (2) whether that conduct constitutes just cause for termination of employment. H. Perritt, *Employment Dismissal Laws and Practice* 226 (1984). We believe that Alaska's courts have adopted this analysis.

The second question is not at issue in this case. The parties do not dispute that drug use on the oil rigs presents a legitimate business reason to terminate employment.

As to the first question, the jury found in its special verdict that Parker did not have just cause to dismiss the plaintiffs. The jury apparently found that Parker did not establish that plaintiffs smoked marijuana on the oil rig as claimed.

■ Therefore, the question this court must address is whether, under Alaska law, Parker must prove that plaintiffs actually smoked marijuana on the oil rigs, or if Parker need only show that it acted in good faith based on the information available. Alaska's common law is clear in wrongful termination cases; the jury is entitled to decide whether the alleged conduct that led to the termination actually took place unless the facts are so one-sided the issue can be decided as a matter of law.

*Rutledge v. Alyeska Pipeline Services Co.*, 727 P.2d 1050 (Alaska 1986), involved a wrongful termination suit brought by a former employee against Alyeska. Alyeska had dismissed the employee for fighting on company property. While the judge in *Rutledge* took the question of whether the employee was actually involved in the fight away from the jury, he clearly indicated that the determination was one of fact, generally to be decided by a jury. The court simply exercised its discretion to decide the question of fact as a matter of law, holding "reasonable jurors must conclude that Rutledge fought on company property . . . ." 727 P.2d at 1056.

■ The *Rutledge* court cited approvingly, albeit on other grounds, *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980), which held that a just cause requirement for termination would be meaningless if the employer were permitted to be the sole judge of whether just cause existed. 292 N.W.2d at 895. In deciding that the question of just cause presented a jury question, the court in *Toussaint* held, "Where the employer claims that the employee was discharged for specific misconduct—intoxication, dishonesty, insubordination—and the employee claims he did not commit the misconduct alleged, the question is one of fact: did the employee do what the employer said he did?" 292 N.W.2d at 896. Moreover, there is no indication in *Rutledge* that the employer's mere erroneous belief, whether reasonable or not, is sufficient to satisfy the "for cause" requirement. We conclude that under the law of Alaska, to carry its alleged burden of just cause for termination, an employer must satisfy its burden of showing the discharged employee engaged in the alleged prohibited conduct. *See also Wilkerson v. Wells Fargo Bank*, 212 Cal.App.3d 1217, 261 Cal.Rptr. 185, 192 (App.1989) ("[A]n employer's subjective be-

lief it possessed good cause does not dispose of a wrongfully discharged employee's claim for breach of contract. Such employee is entitled to recover for breach of contract notwithstanding the employer's state of mind ... If an employer claims that the employee was discharged for specific misconduct, and the employee denies the charge, the question of whether the misconduct occurred is one of fact for the jury."); *McLain v. Great American Insurance*, 208 Cal.App.3d 1476, 256 Cal.Rptr. 863, 870 (1989) (Although employer claimed that employee distributed confidential memorandum in violation of company policy, jury found that there was an implied contract that employee could only be terminated for cause, and that employee had established that he did not distribute the memo or act in an insubordinate manner. Since the employee did not violate the company rules as alleged, "there was substantial evidence to support the jury's verdict that [the employer] did not have cause to discharge [the employee] and therefore breached the implied contract.")

The dissent sympathizes with Parker's obligation to provide a safe working environment for its employees. It cites strong policy arguments against the use of drugs as authority to alter Alaska's law. Judge Kozinski does not believe that the jury should have the prerogative to second-guess Parker's determination that plaintiffs smoked marijuana on the oil rigs. Although we share Judge Kozinski's concern for safety in the workplace,[3] we respectfully do not believe that concern provides us a

mandate to water down centuries of respect for the place of juries in our civil justice system. At this level of our system of jurisprudence—the appellate level—the issue we confront as judges is not whether the use of certain drugs and narcotics is a serious threat to our nation, which it is, or whether the use of marijuana is dangerous to workers on oil rigs, which it is, but whether the verdict of the jury is supported by the evidence presented. The war on drugs can be waged without turning our back on the rightful function of juries in resolving factual disputes.

■ The jury's verdict finds support in the evidence presented at trial. The plaintiffs denied the use of marijuana as charged. They also claimed they had been threatened with "blackballing" from future work on the North Slope if they did not agree to termination. Tom Manix and Gerald Borthwick, both Parker employees who worked on the rigs with plaintiffs, testified they had never seen plaintiffs smoke marijuana on the rigs. Manix testified that he had been instructed to keep an eye on plaintiffs, adding that if they had engaged in prohibited conduct, he would have known it. Another Parker employee, Malcolm Calhoun, testified that it would have been impossible for plaintiffs to have smoked marijuana on the rigs without being detected by other workers.

As we review this evidence, we are guided by the principle that "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury

---

**3.** Judge Kozinski in his dissent frets about the intrusiveness of drug testing as a means of protecting safety in the workplace. In *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1136 (Alaska 1989), however, the Supreme Court of Alaska has explicitly grappled with this issue, holding that even though the right of privacy found in article I, section 22 of the Alaska Constitution prohibits the state from criminalizing the use of marijuana in one's home, that private right must yield to the public policy of providing safe places for employees to work. Thus, Judge Kozinski's concerns are of little moment as they relate to Alaska. Moreover, Judge Kozinski's idea that drug testing is somehow more intrusive and oppressive vis-a-vis privacy rights than standard investigations of peoples' conduct betrays a misunderstanding of

routine police work. These may be his own views, but they may not be those of employees subjected to surveillances, suspensions, and the questioning over extended periods of time of employees' co-workers, friends, and neighbors. It is regrettable that going into the twenty-first century we need magnetometers to protect our airports and drug testing to keep our armed forces and workplaces safe from peril. But it is the genius of our Constitution that it permits us to adapt to the changing world around us. But, let the debate continue. It is in the discussion of these issues that we fine-tune our laws and constantly strive for the balance that preserves our freedom and well being, from excessive intrusion from the government on one hand, and intolerable private behavior on the other.

could have drawn different inferences or conclusions *or because judges feel that other results are more reasonable." Tennant v. Peoria & Pekin Union Railway Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) (emphasis added).

The district court's judgment is

AFFIRMED.

REINHARDT, Circuit Judge, concurring:

I am in complete agreement with the opinion Judge Trott has authored for the Court.[1] I write separately only in order to respond to the dissent's vehement attack on the concept of job security—a concept of fundamental importance to all of America's working men and women. The dissent claims that the result we reach today is "so preposterous it would be laughable if it were not scary," dissent at 215, a remarkable comment considering that the dissent not only flagrantly misconstrues an elementary legal principle in the field of employment law—specifically the meaning of "just cause," a phrase used in most collective bargaining agreements throughout the nation for the past fifty-odd years [2]—but does so in "a dangerous and unprecedented way." Dissent at 207. Under the dissent's interpretation of just cause, "whether plaintiffs did or did not smoke marijuana was not directly relevant to the jury's delib-

erations; all that mattered was whether company officials *reasonably believed* they had." Dissent at 209, n. 7 (emphasis in original). As our dissenting colleague puts it, as long as Parker "reasonably believed that plaintiffs were smoking marijuana on the rig," then it could terminate them on the basis of just cause. In short, the dissent argues unashamedly that it is entirely irrelevant whether the employees actually engaged in any misconduct which could have provided a valid reason for terminating their employment.

Were the dissent to prevail, the focus in employment law in this country would be drastically altered: the focus would no longer be on whether a violation of company policy actually occurred; it would shift entirely to an examination of the employer's subjective state of mind. The job protection that employees have successfully bargained for since the days of Franklin Delano Roosevelt and the New Deal would disappear, to be replaced by the posing, in all potential discharge cases, of a single, radically different question: Was a supervisor's erroneous belief that an employee violated company policy held in good faith? The actual facts of the case would become insignificant—only the employer's mental state would matter. Thus, the dissent proposes a significant reversal of our national labor policy. With a single stroke of the pen, the dissent would effectively eliminate

---

**1.** I might except from this statement a portion of note 3. I am not as sanguine as Judge Trott about the recent curtailments of fourth amendment rights. "Fine-tuning" is not in my view what has been occurring. "Weakening," "eroding" or even "gutting" would be a more accurate description. Nor do I agree that we need more debate concerning the fourth amendment. What we need is a greater sense of commitment *to the fundamental constitutional principles it* represents—and a resolve not to sacrifice those principles in our eagerness to combat illicit drugs, whether that eagerness stems from legitimate concerns or merely from political expediency.

**2.** Generally, just cause provisions are contained in collective bargaining agreements that have been negotiated by unions. In addition, from time to time employers unilaterally promulgate such provisions, as Parker did in the case at bar. On the special verdict forms, the jury was first asked, "Was there an employment contract be-

tween Bowen Sanders, Rodney Cantu, George Howard, and Parker Drilling which required Parker to have just cause to terminate the plaintiffs?" The jury found that a unilateral offer had been made and that, as a result, a contract existed as to all three plaintiffs. That finding has not been challenged by Parker on appeal. The jury then found that Sanders, Cantu, and Howard were terminated by Parker without just cause. This represented the first basis on which the jury awarded damages. Secondly, the jury found that in firing Sanders, Cantu, and Howard, Parker breached its duty of good faith and fair dealing to each. (This is the provision contained in all at-will contracts. *See Rutledge v. Alyeska Pipeline Service Co.,* 727 P.2d 1050, 1056 (Alaska 1986) (citing *Mitford v. de Lasala,* 666 P.2d 1000, 1006–07 (Alaska 1983), discussed *infra* at 199.) In view of the finding on the first issue, the second finding was of no practical consequence, except as added protection for the verdict if the just cause finding were reversed on appeal.

job security, a fundamental right that American workers have laboured long and hard to secure, and would reduce just cause to an almost meaningless concept. The dissent argues unequivocally that its interpretation of just cause should govern all employment contracts. To put it bluntly, given his druthers, Judge Kozinski would make his counter-revolution against workers' rights uniform throughout America, irrespective of the nature of the employee's occupation. Under the new order of affairs, in all sectors of our economy an employer's mere good-faith suspicion would constitute a sufficient basis for terminating a worker's employment rights.

It is not the court's holding, but the dissent's position which is clearly "preposterous." The dissent's interpretation of just cause would leave workers stripped of their basic job rights and personal security—in the future, only a thin, tenuous line would divide the employed from the unemployed. Employees could be fired, at any time, based on their employer's good-faith but nonetheless wholly mistaken beliefs. This threat is especially ominous for older employees, trained in a particular field, who may not readily be able to find other jobs. Clearly, our dissenting colleague fails to understand that job security is the most fundamental employment right possessed by American workers. The just cause provision, when accorded its customary meaning, is crucial to an employee's sense of personal security and stability. With the knowledge that one will not be fired unless one acts in violation of company policy, it is possible to make plans for oneself and one's family. Workers can buy homes, schedule mortgage payments, take vacations, send their children to college, and even plan for retirement. Clearly, hard-won just cause provisions play a crucial role in promoting the confidence of America's workers in their economic futures.

The dissent's position here is directly contrary to a fundamental principle of labor law. It is elementary that "just cause"

for discharge means that the employer must show that the employee committed an act which warrants his discharge. The employer must have a sound basis—a reasonable ground—for his decision to terminate the employee. But the employer does not have a reasonable ground if the beliefs or assumptions on which he bases his decision are incorrect. If the employer cannot prove that the employee engaged in some misconduct which constitutes cause for discharge, he does not have just cause for firing the employee. It is simply *not* enough for an employer to show that he was well intentioned, that his heart was pure or that *if* the employee *had* committed an improper act he would be free to discharge him. It is not enough that the employer had a *mistaken* belief that an employee violated some rule or that it had cause for that mistaken belief. *See, e.g., Wilkerson v. Wells Fargo Bank*, 212 Cal. App.3d 1217, 261 Cal.Rptr. 185, 192 (App. 1989) ("an employer's subjective belief it possessed good cause does not dispose of a wrongfully discharged employee's claim for breach of contract. Such employee is entitled to recover for breach of contract notwithstanding the employer's state of mind."); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880, 896 (1980) ("Where the employer claims that the employee was discharged for specific misconduct—intoxication, discharge, insubordination—and the employee claims that he did not commit the misconduct alleged, the question is one of fact for the jury: did the employee do what the employer said he did?") In short, a termination for just cause must be based on an employee's actual violation of company policy which warrants a dismissal.

Actually, the just cause provision contains a second component as well. The employer must not only have actual cause for discharge, but must act in good faith. It cannot use actual cause as a pretext for an unlawful or invidiously discriminatory action.[3] Nor can it otherwise engage in

---

3. The employer could not single out a union proponent, a black, or a Libertarian for special adverse treatment. If five workers committed

an identical wrongful act that provided actual cause for discharge and the employer fired only the single union supporter, barring some valid

selective enforcement of its rules.[4] Even where actual cause exists, the employer must act fairly and equably. It is this second component which the dissent apparently believes constitutes the entire substance of the just cause provision. The dissent's confusion is best illustrated by its discussion of the jury instructions. The dissent argues that the just cause instruction required the jury to find only that Parker had a reasonable belief that plaintiffs smoked marijuana and not that it had proven any actual misconduct on the part of the discharged employees. Dissent at 207. While the instructions are not a model of clarity, they do not say what the dissent claims they do. Instruction number 7, the just cause instruction, states:

> However, if you find that the plaintiffs have proved by a preponderance of the evidence that the contract included an implied promise or agreement that Parker Drilling would terminate plaintiffs *only for just cause* you must then consider whether Parker Drilling has proved by a preponderance of the evidence that it had *just cause to terminate the plaintiffs for violating Parker's rules or policy prohibiting the use of drugs* at its camps or on its drilling rigs. You are instructed that *just cause is generally a fair and honest cause or reason, regulated by good faith on the part of the employer* in light of all the facts and circumstances. If you find that the plaintiffs have proved that the contract included an implied covenant to terminate only for just cause and Parker Drilling has failed to prove that it had just cause to terminate the plaintiffs, you

must then find for plaintiffs on this issue.

(Emphasis added).

Properly read, the just cause instruction requires the jury to consider two matters: first, did the employees do something for which they deserved to be discharged? Second, did the employer act in good faith, i.e. was its conduct regulated by good faith? Where the employer fails to prove the first element—that the employees' conduct provides actual cause for discharge— the inquiry is over; it does not matter, then, whether the employer acted in good faith. That is precisely what occurred here. Parker failed to prove to the jury's satisfaction that the plaintiffs actually smoked marijuana—and despite all the hyperbole, the dissent does not seriously contest the fact that the jury properly found that Parker did not prove its case on this point. However, as noted *supra*, the dissent proceeds to ignore the first issue altogether and focuses entirely on the second question—whether the employer acted in good faith. In doing so, it fails to recognize that the second question relates only to a limiting provision that does not become relevant unless the employer surmounts the first hurdle by showing improper employee conduct. Only then will it help the employer to demonstrate that it acted in good faith and not out of some unlawful or malicious motive—i.e. that the actual cause was regulated by good faith. The dissent conflates the analysis, so that part two, the subsidiary good faith element, entirely replaces part one, the heart of the just cause provision.[5]

reason for punishing that individual more severely than his co-workers (such as a prior history of misconduct), the discharge would violate the second component of the just cause provision. Thus, while any such discharge might also be prohibited by federal and state statutes, it would certainly be contractually barred by the just cause provision.

4. In the leading just cause for discharge case, *Toussaint*, 292 N.W.2d at 897, the court said, "an employer who only selectively enforces rules or policies may not rely on the principle that a breach of a rule is a breach of the contract, there being in practice no real rule."

5. Even with respect to the second component, the dissent errs seriously. A reasonable jury certainly could have concluded that Parker's conduct was not regulated by good faith because Parker made its decision to discharge the plaintiffs on the basis of flimsy circumstantial evidence (*see* note 11 *infra*), because contrary to its usual practice it failed to set forth the reason for the discharge in the termination notice, and because it threatened to "blackball" or bar the plaintiffs from working on the North Slope of Alaska if they challenged the termination. Thus, the jury could have based its just cause determination on Parker's failure to meet the test set forth by the second—the good faith —component. In fact, the reasons just noted

Moreover, in the case at bar, the jury found against Parker on a second claim, breach of the duty of good faith and fair dealing. The existence of this claim for relief may have contributed to our dissenting colleague's confusion over both the meaning of the just cause provision and the thrust of the just cause instruction. The Alaska Supreme Court has recognized two separate and distinct bases on which an employee can recover for wrongful termination. As that court has said, "[i]n *Eales v. Tanana Valley Medical Surgical Group,* 663 P.2d 958 (Alaska 1983), we recognized that *certain* employment contracts for an indefinite term were terminable by the employer only for good cause. And in *Mitford v. de Lasala,* 666 P.2d 1000, 1006–07 (Alaska 1983), we recognized an implied covenant of good faith and fair dealing in *all* at-will employment contracts. *Id.*" *Rutledge v. Alyeska Pipeline Service Co.,* 727 P.2d 1050, 1056 (Alaska 1986) (emphasis added).[6] The second of these bases, addressed in *Mitford,* only guarantees that employees will be treated in good faith and dealt with fairly. While that basis involves some elements that are similar to the second, and subsidiary, component of the just cause provision, the protection afforded employees under a good faith and fair dealing provision is substantially less than is provided by a just cause clause.[7] The just clause provision is found in fewer agreements and exists only by virtue of a mutual agreement between the employer and employee, usually contained in a collective bargaining agreement, or as the result of the acceptance by an employee of a unilateral offer made by an employer.[8] However, a just cause clause provides true job security. The good faith and fair dealing requirement, in contrast, is implied by law in *all* at-will employment contacts, but it only assures protection against bad faith action by the employer.[9]

The dissent's interpretation of just cause would eliminate the distinction between the two contractual provisions recognized by the Alaska Supreme Court, and reduce the protection provided by the just cause clause to the same minimum level afforded under the good faith clause. Footnote 6 in the dissent demonstrates clearly the fundamental error in its position. Dissent at 209, n. 6. Under the dissent's view of the "just cause" instruction, that instruction sets forth precisely "the same proposition" as the instruction on the good faith provision. *Id.* If that were the case, there would be no need for two separate counts and two different jury instructions. Nor in fact would there be any need for just cause clauses at all. It is this error—the failure to recognize the existence of two distinct bases for a wrongful termination claim and the concomitant failure to recognize that just cause clauses afford far greater pro-

may well also explain why the jury reached the conclusion that Parker acted in bad faith when it found against the company on the second claim for relief. *See* discussion in text immediately following signal.

**6.** *See also Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 792 (Alaska 1986) ("The latter two claims express breach of contract theories which we have previously recognized as enforceable causes of action. *See Eales v. Tanana Valley Medical Surgical Group,* 663 P.2d 958 (Alaska 1983) (certain employment contracts can be terminated only for good cause); *Mitford v. de Lasala,* 666 P.2d 1000, 1006–07 (Alaska 1983) (good faith covenant is implicit in at-will employment contract.)")

**7.** "Where the employee has secured a promise not to be discharged except for cause, he has contracted for more than the employer's promise to act in good faith or not to be unreasonable. An instruction which permits the jury to review only for reasonableness inadequately enforces that promise." *Toussaint,* 292 N.W.2d at 896.

**8.** The unilateral offer may be contained in a company manual or policy statement and be of general applicability, *Jones v. Central Peninsula General Hospital,* 779 P.2d 783, 786–87 (Alaska 1989) (citing *Toussaint,* 292 N.W.2d 880, with approval), or it may be made on a case-by-case basis.

**9.** In this case, the jury found, based on instruction number 9—an entirely separate instruction from the just cause instruction—that Parker breached its duty of good faith and fair dealing as to each of the plaintiffs. That finding was of course independent of the finding that Parker violated the just cause provision. Thus, as I indicated in note 2 *supra,* the jury's just cause finding is bolstered by its finding of a discrete violation of an entirely different clause.

tection for job rights than do good faith and fair dealing provisions—which appears to lie at the heart of the dissent's misreading of the jury instructions. The error may even explain in some part the dissent's hostility towards the basic concept of actual cause as a necessary condition to the discharge of employees who have more than at-will relationships with their employers.

Finally, in its attempt to discredit the significance of the definition of just cause set forth in the leading just cause for discharge case, *Toussaint,* 292 N.W.2d 880, the dissent relies on wholly inapplicable decisions.[10] Dissent at 211. The just cause principle applies when the employer fires an employee for disciplinary or retaliatory reasons, not when it is required by economic circumstances to reduce its work force. "Indeed, the *Toussaint* Court implicitly recognized that wrongful discharge claims must necessarily be predicated upon some concept of employee or employer 'fault.' " *Boynton v. TRW, Inc.,* 858 F.2d 1178, 1183 (6th Cir.1988). Terminations due to *adverse economic conditions,* where no one is "at fault," arise in an entirely different contractual context. The

rules governing layoffs—when an employer can reduce the work force and which employees must be laid off first and rehired first—are governed by seniority provisions, not just cause clauses. The reduction in force clauses constitute a wholly separate part of the collective bargaining agreement from the disciplinary sections. The dissent ignores this fundamental difference and relies on layoff cases for the principle that "courts applying Michigan law have acted to limit *Toussaint* by circumscribing the jury's role." Dissent at 211. This is simply a flagrant, although undoubtedly inadvertent, distortion of the caselaw. "Michigan's courts have never held the *Toussaint* doctrine of just cause applicable to layoffs arising out of an economically mandated reduction in force." *Boynton,* 858 F.2d at 1179–80. Neither have any other courts or arbitrators. The just cause doctrine has nothing to do with "no fault" reductions in force. To rely on *non-just cause* cases—layoff cases—for the proposition that the jury's role in just cause cases has been circumscribed is plainly to misconceives the basic nature of the case law in this area.[11]

**10.** In its less than ten year history, *Toussaint* has been cited with approval by the courts of at least 38 states, and in at least 19 federal courts of appeals decisions.

**11.** In spite of its position that reasonable suspicion constitutes just cause for discharge, the dissent implies at some points that Parker had more than enough evidence to prove that appellees conducted themselves in a manner that warranted discharge, "Parker Drilling obtained no fewer than three eyewitness reports that plaintiffs were using drugs on the job before firing them. To wait any longer or look any closer would have been reckless." Dissent at 209. While the primary points of contention between the majority and the dissent are issues of law, I should point out that there are egregious mistakes in the dissent's presentation of the facts as well. In truth, Parker had a very weak case, and when it made its discharge decision, it relied on circumstantial evidence that plaintiffs were smoking marijuana without obtaining persuasive evidence that they had in fact done so. At the time of termination the case developed by Parker against the employees was based largely on the signed statements made by Bill Reynolds and Joe Watkins on February 23, 1983. Reynolds related an incident which had allegedly occurred eight months earlier, when he saw Sanders and Cantu go up into the "mud

shack," where the chemical level of the mud was tested. Reynolds, who was outside the shack, claimed to have observed Sanders, who was inside, approach the window of the shack with what appeared to be a joint in his hands. When he went up to investigate, Reynolds noticed an aroma but did not find marijuana in Sanders' or Cantu's possession or anywhere in the room. Parker viewed this as significant evidence even though the employee working and living in the mud shack at the time stated in his deposition that he never saw plaintiffs smoking marijuana nor smelled the presence of marijuana in the shack.

The second written statement, by Joe Watkins, referred to an incident that allegedly occurred six months prior to the inspection tour. Watkins allegedly saw Howard retrieve a bag from a hiding place "under the camp," but at no time did Watkins specifically identify the substance in the bag. Four days later, he observed Howard and Cantu enter the exercise room, and after smelling what he believed to be marijuana smoke come out of the window, he quickly walked into the room to surprise them. The surprise was Watkins'; for, he did not see Howard or Cantu smoking marijuana nor did he see the substance on their persons or anywhere in the exercise room.

Grudgingly, our dissenting colleague concedes, in the latter half of his exegesis, that despite his own personal predilections some courts may conclude that employees should be able to obtain the protections of a traditional just cause provision, i.e. one that protects them against discharge unless they have engaged in misconduct which provides cause for termination. If so, he argues, those courts should promulgate a sweeping "public policy exception." "If we are going to read the rule of *Toussaint* into Alaska law, therefore, we should temper it by including a public policy exception that takes into account the practical realities of running a dangerous business." Dissent at 215. Any such exception, in my opinion, would constitute wholly unwarranted and unprecedented judicial legislation. It reflects a philosophy of labor-management relations and workers' rights that is not only contrary to the prevailing national policy, (*see* Labor Management Relations Act of 1947, 29 U.S.C. § 151 et seq. (1990)), but also lacks any basis in constitutional, statutory or decisional law.[12] Equally important, the dissent's proposed exception is so broad that it not only encompasses workers in fields that traditionally affect public safety—such as airline pilots and nuclear plant workers—but also those employed in industries using heavy machinery, such as auto workers, steel workers, loggers and miners. The exception for "safety-sensitive activities" would include each and every company involved in "manufacturing ... and thousands of other hazardous activities...." Dissent at 218.

Logically, under the dissent's view, unions representing individuals working in any of these "dangerous" areas would be prohibited from negotiating collective bargaining provisions protecting innocent employees from discharge, and employers would be prohibited from offering job security guarantees to job applicants. Were Judge Kozinski's dissent ever to become the law of the land, courts would be compelled to eliminate just cause provisions from all collective bargaining agreements covering workers employed in literally millions of jobs. All that unions and employees could freely bargain for under the dissent's view would be an employer's mistaken suspicions. By accepting employment on an oil rig or in a steel mill, workers would be compelled to forfeit the opportunity to require employers to prove an actual violation of a contract, policy or rule before terminating them.

If courts accepted the views of our dissenting colleague, the consequences would be staggering. Workers in numerous in-

---

Further investigation consisted of a brief conversation between Coven Chapman, a former roommate of Howard and Cantu, and Gary McCarrell, the Division Manager, at the Anchorage Airport. Significantly, Parker Drilling conceded that its primary evidence was so weak *that it could not have fired the three employees* without this additional evidence. And what did this additional evidence consist of? When asked why he moved out of the room he shared with Howard and Cantu, Chapman responded that it was too noisy and that there was too much traffic in the room. He also made vague references to other problems. However, in no way did he say directly that he had witnessed the three plaintiffs smoking marijuana. Although two months later he executed a post facto affidavit stating that he had seen his fellow employees smoking marijuana, earlier at the time of the Labor Board hearing, Chapman specifically testified that at the airport he did *not* tell McCarrell that plaintiffs were using drugs. The other individual confronted at the airport refused to discuss the matter with company representatives.

On the basis of the above information, Parker decided to terminate the three plaintiffs. Clearly, this circumstantial evidence was far from conclusive. In any event, all of the evidence Parker introduced at the trial was directly controverted by the testimony of plaintiffs' witnesses, and the jury was free to believe whichever set of witnesses it chose. The inconsistency in Chapman's stories was undoubtedly a factor the jury considered.

12. The public policy exception Judge Kozinski purports to rely on is entirely different in nature. On occasion, some courts have invoked public policy to preclude an arbitrator from reinstating to a particular safety position an employee who has been proved to have acted recklessly in his performance of that job. Public policy has never been invoked to preclude reinstatement of an employee who has been adjudged innocent of the alleged misconduct by the finder of fact. Most important of all, as far as I am concerned, no court has ever suggested that any tenet of public policy precludes enforcement of a just cause clause in *any* area of employment. *See* discussion *infra* at 202.

dustries throughout the nation could no longer be assured that they would not be discharged as long as they performed their jobs properly. Speculation, whether or not later shown to be erroneous, would be sufficient as a matter of law for acts of economic capital punishment in a whole range of occupations. Standard job security provisions long in effect in almost all industries, (including those implicating safety concerns,) would be banned as a matter of public policy. A twenty-year employee, six months away from a fully-pensioned retirement, could be fired on the basis of rumor, innuendo, or unsubstantiated hearsay, even though an objective fact-finder would be required to conclude that there was insufficient proof of guilt. Any attempt to provide greater job protection, whether by negotiated agreement or the unilateral act of an employer, would be verboten.

Judge Kozinski's view clearly does not reflect the ethos of twentieth century America, where job security is for many of our citizens, one of their most valued rights. The fundamental question is not whether a particular individual is a paper-pusher in an office or an oil rig worker, but whether that employee committed an improper act that warrants discharge. No public policy bars this wholly salutary and humane rule. The sweeping exception urged by my disenting colleague should be swiftly and firmly repudiated.

Regretfully, I must add that in addition to its disregard for traditional tenets of job security, the dissent demonstrates an equally blatant disdain for the fundamental concept of guilt and innocence. The dissent fails to acknowledge even once that the plaintiffs were innocent—and that a jury so decided. Instead, it appears to elevate the employer's beliefs to the status of an eternal verity. If a supervisor, or presumably a United States Attorney, has reason to believe a worker is guilty, then

that must be the case—and off with the worker's head. Even the unanimous judgment of a jury that the appellants here were innocent cannot shake my colleague's faith in employer omniscience. There is one point at which Judge Kozinski's fundamental approach to guilt and innocence appears at its starkest. He cites a series of cases in which discharges of workers guilty of drug abuse were upheld by the courts. Dissent at 214. He then says, "similar considerations of public safety" require the same result here. Incredibly, the dissent fails even to mention the distinction that must immediately arise in the mind of any person familiar with the elementary concepts of our legal system, and would be determinative, I would hope, in the case of all fair-minded individuals. I refer, of course, to the fact that in every one of the cases cited by the dissent, the person discharged was *guilty*. Here, according to the jury, the employees were not. This simple distinction is one that fails to influence Judge Kozinski.[13]

There is nothing in Judge Trott's opinion for the court which is "novel" or "unprecedented." The only cause for alarm in today's deliberations is the concept trumpeted in the dissent that employees should be prohibited by judicial fiat from negotiating the type of job security agreements they have enjoyed for almost sixty years. What is both novel and unprecedented is my dissenting colleague's strident objections to the application of traditional concepts of fairness and due process in the employment arena. American workers have laboured long and hard for the right to be secure in their jobs if they serve their employers faithfully and well. Our courts must safeguard this important right, in order to ensure that the working men and women of this nation continue to enjoy some measure of justice and fair treatment.

\* \* \* \* \* \*

13. Since, under the dissent's interpretation, guilt or innocence appears to be secondary to safety considerations, Judge Kozinski's arguments regarding safety concerns could just as easily be advanced as a justification for imprisoning persons whenever the government believes in good faith that they are guilty of an offense or pose a threat to the safety of other citizens. The dissent's approach, whether urged by a prosecutor in a criminal case or proclaimed by a judge as a matter of national policy in a civil case, is clearly inconsistent with the basic tenets of our judicial system and the American Constitution.

In response to the above concurrence, the dissent has appended two remarkable footnotes suggesting that the concept of just cause may be applied differently in a unionized workplace and that overriding public policy concerns may be inapplicable in that context. *See* dissent at 212, n. 11 & 215–16, n. 18. The two footnotes strongly imply that where a collective bargaining agreement exists an employer may have to prove that the employee is guilty of the alleged act when terminating him for just cause. They also suggest that the public policy exception for workers in "safety-sensitive" fields may be inapplicable if the work force is unionized. However, while the footnotes may give union members some hope that they, unlike their unorganized brothers and sisters, will be able to enjoy the customary benefits of job security, a careful reading of the text, and a cursory review of the applicable law, make it plain that were my dissenting colleague's position to be adopted that hope would quickly prove illusory.

Under the lucidly and forcefully expressed philosophy of the dissent, the ultimate outcome for any employee charged with violating company policy, and certainly for those in "safety-sensitive" positions, would clearly be no different whether the employee were covered by a union contract or not. The possibility of different treatment for unionized workers suggested in the strangely paradoxical footnotes is flatly contradicted by the entire thrust and import of the dissent, as well as by clearly established law. Nothing in the *text* of the dissent suggests that different treatment for unionized workers would be appropriate or that unionization would lessen the omnipresent potential for "disaster" in safety-sensitive fields. Dissent at 216. Nor does anything in the *text* indicate any willingness to let an arbitrator, as opposed to a jury, override the "public policy exception" that Judge Kozinski believes to be essential in the case of all "safety-sensitive" positions.

More important, it is clear that the law does not permit the ephemeral distinction floated in Judge Kozinski's rebuttal footnotes. To exempt arbitrations from my dissenting colleague's proposed new rule would make no sense from a legal standpoint. This is apparent from the fact that in support of his novel public policy argument my colleague relies *exclusively* on cases involving decisions made by arbitrators pursuant to collective bargaining agreements. If, in fact, Judge Kozinski's public policy exception were adopted by the courts, it would swiftly and surely be applied in the collective bargaining context, as well as in the case of all other contracts. The law is clear that collective bargaining agreements *are* subject to public policy exceptions, *see* dissent at 214 and there is nothing unique about the exception advocated by my dissenting colleague. As the cases he relies on demonstrate, public policy exceptions override the provisions of just cause clauses. *See Delta Air Lines v. Air Line Pilots Ass'n,* 861 F.2d 665, 666–68 (11th Cir.1988); *Amalgamated Meat Cutters v. Great Western Food Co.,* 712 F.2d 122, 123–24 (5th Cir.1983); *Georgia Power Co. v. IBEW, Local 84,* 707 F.Supp. 531, 533–34 (N.D.Ga.1989), *aff'd,* 896 F.2d 507 (11th Cir.1990). For a full discussion of the topic, *see Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200 (9th Cir.1989) (en banc); 886 F.2d at 1217 (Trott, J., dissenting). Thus, no serious weight can be given to the footnotes' effort to obfuscate the true effect of the dissent's revolutionary proposal.

Regrettably, footnotes notwithstanding, my dissenting colleague's thesis leads quite clearly and inevitably to certain inescapable conclusions. Under the dissent, employers would be free to terminate their employees based on mere good faith belief that the workers smoked marijuana at the worksite—whether the workplace were unionized or not. It is equally clear that as far as my dissenting colleague is concerned whether the employees actually smoked marijuana is irrelevant in all types of discharge cases. In fairness to the impassioned arguments set forth in his dissent, I cannot conclude—and I doubt that any objective reader would—that Judge Kozinski would have been satisfied with the verdict

in this case had it been rendered by an arbitrator rather than by a jury. The parade of horribles, the catastrophic events that the dissent relates, the fears of drug-crazed workers punching the wrong button, all the public safety concerns (*see e.g.,* "Plaintiffs in our case, by contrast, were engaged in work so dangerous that a single slip could easily kill a co-worker or unleash an environmental catastrophe." Dissent at 215), surely would not evaporate into thin air simply because the just cause clause was contained in a written rather than an oral agreement.

While I appreciate the dissent's expressed respect and regard for union contracts, I cannot agree with my colleague that a significant cause for the decline in voluntary unionization is the increased availability of judicial remedies for non-union workers.[14] Dissent at 212, n. 11. Although Judge Kozinski's thesis may have some basis in fact, a far more significant reason for the decline in union membership is the basic hostility shown by the federal government to unions, and to workers rights, in recent years. Following the example of the federal government, over the past decade private industry has engaged in unprecedented strike-breaking and other anti-labor activities, and has thereby undermined the historic vitality of labor organizations. The anti-union sentiments of recent administrations, far more than any developments relating to judicial remedies, account for the difficulties that unions face today.

On the subject of judge-made law, I believe my colleague's effort to justify converting his own highly expansive view of "bosses' rights" into a new national public policy for all American workers is based in part on a faulty premise. Contract law is not judge-made law. When a court finds as a matter of fact that an employer has offered his employees a just cause clause as a condition of employment and that the employees have accepted their positions in reliance thereon, that is not judge-made law. That is elementary contract law. Of course, all contracts are subject to a public policy exception; it is elementary that courts do not enforce contracts that violate public policy. But no one other than Judge Kozinski has ever suggested, as far as I am aware, that an agreement to require actual cause for discharge—actual wrongdoing—violates public policy. And whether that agreement is contained in a written collective bargaining agreement, written individual employment contract, a company policy or manual distributed to all interviewees, an oral bilateral contract, or an oral statement relied on by the worker is wholly irrelevant for the purposes before us. The judge-made law gambit is clearly just that: Either there is an overriding public policy that precludes the enforcement of contractual just cause protections in "safety-sensitive" positions or there isn't. I repeat—until today no one has ever suggested that there is. And, I would hope that after today the suggestion will be sufficiently discredited that no one will repeat it in the years to come.

KOZINSKI, Circuit Judge, dissenting:

Working on an oil rig is dangerous business. It requires total concentration, precise timing, a fair degree of coordination and a significant amount of speed. Rig accidents can have disastrous consequences, ranging from severed limbs and multiple deaths to massive despoliation of the environment. It goes without saying that drug abuse has no place on oil rigs and that a company operating oil rigs has the right—indeed, the obligation—to take decisive action when it obtains reliable information that some of its employees may be abusing drugs while on duty.

This is the unhappy tale of a company that did just that. Company officials reasonably believed that three employees had used drugs on the job, not once but repeatedly. Two eyewitnesses fingered the drug-using employees; the company pursued the matter promptly, but not precipitously, obtaining confirmation from yet a

---

**14.** Nor, although I appreciate Judge Kozinski's concern for the rights of individual workers, am I persuaded by the Wall Street Journal, *see* dissent at 217, that protecting individual workers' rights will in the long run hurt all workers.

third eyewitness before discharging the violators. The personnel action was taken in a balanced, detached, professional manner, free from any hint of rancor or personal animosity. Had the company acted less decisively, it would have betrayed its responsibility to other employees and the environment we all share. Yet when all is said and done, the fingered employees walk off with a cool third of a million dollars, while the company is left to pick up the tab, pay its lawyers and scratch its head wondering what it could have done differently. It is a question we all might ponder as we contemplate the bitter lesson of this cockeyed morality tale.

The majority characterizes this as a run-of-the-mill case, a cursory review for sufficient evidence. But there's much more going on here. First, the majority violates a fundamental tenet of appellate review by upholding a verdict on a theory that was never presented to the jury. The jury was instructed to decide whether Parker Drilling discharged plaintiffs for just cause, defined by the court as a good faith belief that plaintiffs were using drugs on the job. Plaintiffs did not object to this instruction; accordingly, it is the law of the case. A careful review of the record discloses that no rational jury could have concluded that Parker failed to act in good faith. The majority nevertheless upholds the verdict against Parker, explaining that the jury was really deciding not whether company officials reasonably believed plaintiffs had violated the drug ban, but whether plaintiffs in fact did so. The majority thus upholds the verdict by ignoring the law of the case.

The majority next explains that Alaska law is clear: A good faith belief is not enough to constitute just cause. But it wasn't clear to the district judge, who instructed the jury that good faith was enough; it wasn't clear to plaintiffs, who never raised this argument at trial, in post-trial motions or on appeal; and it most certainly is not clear to me.

Worst of all, today's decision makes us the first court in the country to require an employer to prove to the satisfaction of a jury that employees involved in an inherently hazardous activity, whom they reasonably suspected of using drugs on the job, were in fact guilty of doing so. The majority takes this action casually, without acknowledging the serious public policy consequences of its ruling. In so doing, my colleagues take a giant leap into a dangerous and heretofore uncharted no-man's land, ill-serving the causes of environmental hygiene, industrial safety and worker privacy.

### Facts

Plaintiffs Cantu, Howard and Sanders worked as floor hands on Rig 191, one of several oil rigs operated by Parker Drilling Company on Alaska's North Slope. The floor area is probably the most dangerous part of the rig: In its center is a large drilling hole that is often overflowing with mud or has mud spraying out of it, making the floor slick and treacherous. As floor hands, plaintiffs' job was to place in the hole and connect together 90–foot segments of steel pipe, each weighing 1500 lbs. Making matters more difficult, they had to perform this hard physical labor outdoors in temperatures of 30 degrees below zero, working with heavy iron tools, the lightest of which weighs more than 400 lbs. Worse still, the floor surrounding the hole is not stationary. Known as a rotary table, it quite frequently turns without warning, occasionally taking with it the leg of an inattentive floor hand. At its best, the work is hazardous—injuries are frequent, ranging from bruises and cuts to severed fingers and arms; at its worst, men lose their lives. Because of the enormous danger involved, Parker has a strict ban on the use or possession of drugs or alcohol on the rigs.[1] Cantu, Howard and Sanders testified that they were well aware of the ban.

During a routine inspection of the North Slope rigs on February 22, 1983, Safety

---

**1.** Parker is not concerned with drug use by employees while they are off the rig; only drug use on the rigs, or immediately prior to transportation thereto, is prohibited.

Director John Haynes was told by two employees—Billy Reynolds, a supervisor on Rig 191, and Joe Watkins, a rig employee who had formerly been a police officer—that plaintiffs were routinely smoking marijuana before and after shifts and on breaks during shifts. Immediately upon returning to the company's main office in Anchorage the following afternoon, Haynes reported these accusations to Gary McCarrell, Parker's Division Manager. The undisputed testimony discloses that McCarrell and his staff took the accusations very seriously, giving the matter their full attention. Hesitant to discipline employees on what might have been mere rumor, McCarrell telephoned the rig and asked that Reynolds and Watkins put their allegations in writing. Both men made out handwritten statements and faxed them to McCarrell the same evening. McCarrell and other Parker managers stayed in the office late that night to receive the faxes and formulate a reasoned strategy for dealing with the problem. None of the managers involved in making the decisions—McCarrell, Glenn Mosley and Faye Upchurch—were personally acquainted with Cantu, Howard or Sanders.

Reynolds' and Watkins' statements disclosed that each man had seen the plaintiffs smoking and/or handling marijuana on the rig, and that other employees had mentioned smelling marijuana smoke coming from plaintiffs' room. RT 3:84–86. Based on these statements, McCarrell decided to suspend plaintiffs, who at that time were off the rig on a normal two-week rotation. The suspension was to prevent plaintiffs from returning to the rig for their next shift, something McCarrell considered too dangerous in light of the serious allegations made against them. Still,

in an effort to be entirely fair, McCarrell sought independent confirmation of the allegations before discharging plaintiffs.

Confirmation came on February 25, when McCarrell interviewed Covan Chapman, who had earlier roomed with plaintiffs. When McCarrell told Chapman that his former roommates were charged with on-the-job drug use, Chapman responded, "I told those guys this was going to get them.... [T]hat is why I moved out of that room.... I told those guys this was going to happen to them." RT 3:186–87; *see also* 3:25. On the basis of this information, McCarrell fired the plaintiffs.[2] So as not to ruin their chances for employment elsewhere, however, the discharge papers noted the reason for termination as violation of company policy.

On this record, no rational jury could have concluded that Parker failed to act in good faith. All the facts I have recited are wholly uncontroverted. Plaintiffs do not dispute that Reynolds and Watkins reported them to Haynes, that Haynes promptly informed McCarrell, that Reynolds and Watkins put their accusations in writing or that McCarrell sought and obtained further confirmation of the allegations from Chapman. Plaintiffs also admit that Parker Drilling had a strong policy against drug use on the job, that they were well acquainted with the policy and that they understood the reasons for it. Plaintiffs suggest no ulterior motive McCarrell, Mosley or Upchurch might have had for firing them.

Plaintiffs' case at trial rested entirely on the theory that objective facts surrounding the terminations would prove the company had not acted in good faith. *See* pp. 207–09 & n. 4 *infra*. Plaintiffs never claimed

---

2. The concurrence suggests that Chapman never directly confirmed that he had seen the plaintiffs use drugs and that Chapman moved out of the room he shared with Howard and Cantu because it was "too noisy" and "there was too much traffic." Concurrence at 201 n. 11. However, the quote reproduced in text shows that Chapman moved out because he feared that his former roommates' on-the-job drug use would get them into trouble. Later, Chapman signed an affidavit to the same effect: "In [the] course of my duties I roomed and worked with

Rhodney Cantu, George Howard, and Bowen Sanders. On more than one occasion I saw all three of these people smoking marijuana while on the job and/or while at camp. I specifically warned each of them that they should knock it off and what the consequences would be. They chose not to listen." RT 3:27–28. Chapman so testified at plaintiffs' unemployment compensation hearing. At that time he also confessed having joined them in smoking marijuana. In so doing, he risked termination and did, in fact, suffer a severe reprimand.

that the case turned on whether they in fact used drugs. Yet it is this point, conceded by plaintiffs, that the majority relies on to uphold the verdict. The majority never once suggests that the jury could have found a lack of good faith, and with good reason: The record simply would not support such an assertion. Rather, the majority changes the relevant inquiry. As I shall explain, the majority's approach conflicts with an unbroken line of cases in this circuit which hold that jury instructions not objected to at trial may not be challenged on appeal. The majority also interprets Alaska law in a dangerous and unprecedented way, and wholly ignores serious public policy concerns.

### Discussion

### I. The Law of the Case

Federal Rule of Civil Procedure 51 provides: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Simply put, if you didn't object to an instruction in the district court, you can't challenge it on appeal. Even though the instruction may misstate the applicable law, that misstatement binds the parties because no one complained when the instruction was given. *See, e.g., Benigni v. City of Hemet*, 879 F.2d 473, 477 (9th Cir.1989) (plaintiff prevailed on first amendment claims that were possibly invalid under Supreme Court precedent, but defendant's failure to object precluded review on appeal). This rule makes a great deal of sense. Justice is not served by going through all the bother and expense of a jury trial only to have one of the parties point out long afterward that there was some glitch in the way the issues were framed for the jury so that the process must start from scratch.

Here, the jury was instructed that Parker acted with just cause if company officials reasonably believed plaintiffs were smoking marijuana on the rig. The district judge charged the jury as follows: "You are instructed that just cause is generally a *fair and honest* cause or reason, regulated by *good faith on the part of the employer* in light of all the facts and circumstances." CR 94a, Instruction No. 7 (emphasis added). Plaintiffs didn't challenge the propriety of this instruction. Just before reading the charge, the district judge gave the parties an opportunity to object. The company objected to three of the instructions, including the one defining just cause; plaintiffs, on the other hand, stated they were "satisfied with the instructions" and had "no objections." RT 6:2.

Nor can there be any doubt that plaintiffs understood that the instruction focused on what the company subjectively believed, not on what plaintiffs actually did.[3] The record is replete with acknowledgments by plaintiffs' counsel that jury instruction number seven limited the jury to considering whether the company acted in good faith. Plaintiffs' strategy was to cast doubt on Parker's motivation by getting the jury to draw inferences of bad faith from certain "objective evidence"— *i.e.*, (1) that plaintiffs never actually smoked marijuana while on Rig 191; (2) that they were treated unfairly in comparison to other employees suspected of using drugs; and (3) that they were threatened with "blackballing" if they contested their termination. As plaintiffs' counsel explained it,

> The focus in both of those jury instructions is very clearly on good faith.... [It] includes that requirement that the jury find that there was a good faith belief on the part of the defendants that what they were doing was correct.
>
> ... And I would agree that a jury is not to sit in per se; nor is the judge to sit in per se and second guess a company.
>
> On the other hand, the only way we can ever measure what [defendant] wants us to measure is whether a company is motivated by good faith is by some

---

**3.** The majority suggests at one point that the jury was instructed to determine whether plaintiffs had actually used drugs on the rig. *See*

Majority at 193. My colleagues are mistaken. *See* pp. 207–09 & n. 4 *infra*.

objective evidence that is brought before the court that the jury then looks at.... RT 7:11–12.[4]

On appeal, plaintiffs adhere to this reading of the jury instruction and make no complaint as to its accuracy:

> Parker argues that the question is whether it could have reasonably concluded that plaintiffs violated the drug ban. *Plaintiffs agree that that is the issue.* The jury was entitled to review the objective evidence which was available to the employer at the time of plaintiffs' terminations in light of the employer's personnel policies, rules and past practices to determine whether or not

*Parker could reasonably have concluded* that plaintiffs violated the drug ban.

Brief for Appellees at 19–20 (emphasis added). In fact, plaintiffs have never wavered from this position.

In reviewing a jury verdict, it is our job to determine whether there was sufficient evidence to support the jury's answer to the question posed, not to some *other* question. After all, we review the record of the trial actually conducted below, not that of some hypothetical trial that might have been conducted. The majority does not dispute that Parker had a good-faith belief that the plaintiffs used drugs on the job;[5]

**4.** Plaintiffs made the same argument when they opposed the company's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on the ground that instruction number seven placed too heavy a burden on the company. Plaintiffs pointed out in their papers that "the complained of instruction did exactly what defendant contends it should have—it put the focus of the inquiry on *the employer's subjective motivation and good faith,* rather than on the objective evidence supporting the conclusion that the employees committed the offense." CR 108, at 22 (emphasis added). At oral argument on the motion for JNOV, plaintiffs' counsel reiterated that the focus of the instruction was "that the jury find that there was a good faith belief on the part of the defendants that what they were doing was correct," and that there was "ample evidence" to show "there was a lack of good faith." RT 7:12–13.

**5.** The concurrence's attempt to portray Parker's belief as erroneous, *see* concurrence at 200 n. 11, is beside the point. It does not dispute the key fact of this case—that *at the time Parker acted* it had reason to believe and did believe that the plaintiffs were using drugs on the job. The concurrence instead relies on information that Parker did not have when it had to decide whether to send the men back on the rig. Because the information was not available to Parker at the time it was required to make the decision, it is irrelevant to whether Parker acted in good faith.

Contrary to the concurrence's assertion, no rational jury could have found that Parker lacked good faith. Although the way the majority has resolved the case makes the existence of good faith irrelevant, the evidence of lack of good faith was in fact insufficient. The key element missing from plaintiffs' case is the slightest hint that Parker acted out of an improper motive; indeed, it would have been exceedingly difficult to find one as Mosely, McCarrell and Upchurch, the managers who made the decision to discharge, did not even know the plaintiffs. The failure to allege an improper

motive alone should have kept this case from the jury. *See* p. 211 n. 10 *infra.*

Plaintiffs utterly failed to prove the elements of their disparate treatment claim, that Parker denied them the benefit of procedures it made available to other employees by agreement, policy or practice. *See* Jury Instruction No. 9 (disparate treatment claim requires showing of practice or procedure denied to plaintiff but given to others); *see also Arco Alaska v. Akers,* 753 P.2d 1150, 1155 (Alaska 1988). Contrary to plaintiffs' contentions, there was no policy of searching employees' rooms or conducting urinalyses before discharging them for substance abuse: In 1981 or 1982, a high ranking employee was terminated when a single eyewitness reported having seen him drink alcohol on the rig. RT 4:81, 5:41. Another employee was fired on the spot when he climbed off a helicopter onto an oil platform and his supervisor suspected that he had been drinking. In neither case was a urinalysis or a body or room search done. RT 4:81, 5:41. On two occasions employees were disciplined or dismissed for drinking; there was no indication of any search or urinalysis. Plaintiffs' Exhibit 16 at 9; *id.* at 15. The only room searches in the record were part of a massive drug raid conducted on July 13, 1982, which yielded a large quantity of drugs. *See* p. 215 *infra.* Although the raid implicated fourteen employees, only two were discharged. The reason? In general, identifying the owner of the stash was impossible because the employees shared rooms and there were no eyewitnesses. RT 2:225–36. Of the eight non-raid related disciplinary actions in the record, at least two and perhaps as many as four were based on the statement of a single eyewitness. Here, Parker had two eyewitnesses. Parker nonetheless gave the plaintiffs the benefit of the doubt and waited until it got confirmation from a third eyewitness. If anything, plaintiffs were treated better than other employees accused of substance abuse.

The implausible threat to blackball the plaintiffs if they contested their discharge—which of

instead, the majority changes the relevant inquiry:

> [T]he jury found in its special verdict that Parker did not have just cause to dismiss the plaintiffs. The jury apparently found that Parker did not establish that plaintiffs smoked marijuana on the oil rig as claimed.

Therefore, the question this court must address is whether, under Alaska law, Parker must prove that plaintiffs actually smoked marijuana on the oil rigs, or if Parker need only show that it acted in good faith based on the information available.

Majority at 194.

This is where the majority loses me. That there was insufficient evidence to cast doubt on the company's good faith should be the end of the matter; we are obliged to overturn the verdict.[6] We may not inquire whether plaintiffs might have prevailed if just cause had been defined differently;[7] like the parties, we are stuck with the definition set out by the district court in

instruction number seven. Rule 51 would clearly preclude us from considering a last-minute challenge to this instruction by plaintiffs; the same rule also precludes the majority from disregarding the instruction on its own initiative.

## II. Alaska Law

While I find the majority's disregard of a long-standing procedural rule troubling, my most serious disagreements with the majority are on issues of substantive law.

I find especially troubling the following statement in the majority opinion: "Alaska's common law is clear in wrongful termination cases; the jury is entitled to decide whether the alleged conduct that led to the termination actually took place unless the facts are so one-sided the issue can be decided as a matter of law." Majority at 194. I understand why the majority would like Alaska law to be "clear" on this issue: A plain error exception to Rule 51, if one existed in this circuit,[8] could only help

course management vehemently denied, RT 3:90–92, 3:178–82, 5:70—also fails to raise an inference of bad faith discharge. Parker actually preserved plaintiffs' ability to find future employment by listing the cause for discharge as "violation of company policy" rather than branding plaintiffs as drug users. Plaintiffs' Exhibits Q, AC, AK; *see* RT 2:215–16, 3:96–97, 3:191–92, 4:91. And plaintiffs did in fact find comparable employment. RT 1:96, 2:41, 2:43–44, 2:152–53. In any event, a threat to blackball employees, even if shameful or actionable in its own right, is irrelevant to whether the decision to *discharge* was wrongful. Threatening employees *after* dismissing them to persuade them not to contest their discharge does not taint an otherwise proper termination. *Cf. Funk v. Sperry Corp.*, 842 F.2d 1129, 1132–33 (9th Cir.1988) (where "layoff was otherwise fully consistent" with company policy, claim of post-discharge scheme to conceal employer's failure to conduct contractually required review of the layoff was insufficient to establish a "plot to disguise the true motive for ... termination").

**6.** The jury found in plaintiffs' favor on two theories, absence of just cause and breach of the implied covenant of good faith and fair dealing. The majority's implicit acknowledgment that the record evinced no lack of good faith by Parker renders the verdict clearly erroneous on both counts. As explained above, the instruction on just cause demanded a verdict for Parker if the jury determined that company officials reasonably believed plaintiffs had smoked marijuana on the rig. The instruction on the

good faith issue stated the same proposition even more clearly: "If you find that Parker honestly believed that termination was for a legitimate business reason, you must find for Parker on this issue, even if you also find that Parker was mistaken in that belief." CR 94a, Instruction No. 9.

**7.** Nor can the majority plausibly argue that the two definitions of just cause somehow merge—for example, that the jury, in concluding that plaintiffs did not in fact use drugs, determined *a fortiori* that Parker failed to act in good faith. The jury was told quite explicitly that Parker could have acted in good faith *even if* it was wrong about plaintiffs' drug use. *See* n. 6 *supra.* Thus, whether plaintiffs had or had not smoked marijuana was not directly relevant to the jury's deliberations; all that mattered was whether company officials *reasonably believed* they had. Plaintiffs have consistently conceded that this was the issue. *See* pp. 207–09 & n. 4 *supra.*

**8.** In holding that the jury was properly entitled to answer a different question than that posed in the district court's instructions, the majority appears to invoke *sub silentio* a plain error exception to Rule 51. Our circuit is unique, though, in holding that there is no plain error exception to Rule 51. *See, e.g., Brett v. Hotel Employees and Bartenders Union, Local 879*, 828 F.2d 1409, 1414 n. 7 (9th Cir.1987); *Bock v. United States*, 375 F.2d 479, 480 (9th Cir.1967);

plaintiffs if the district court's just cause instruction so grossly misstated the law as to amount to a miscarriage of justice. I do not understand, though, how the majority could conclude that Alaska law is "clear" based on the scant caselaw it cites in its opinion. Obviously, neither the district judge nor plaintiffs' counsel, all based in Alaska, shared the majority's understanding of state law. Nor do I.

The majority cites only two cases supporting its assertion that Alaska law is clear as to what constitutes just cause. First, it cites a decision of the Alaska Supreme Court, *Rutledge v. Alyeska Pipeline Serv. Co.*, 727 P.2d 1050 (Alaska 1986). *Rutledge* stands for the unremarkable proposition that, where fighting on company property is a terminable offense and the employee *admits* he was involved in a fight, the trial court can properly direct a verdict for the employer. *Id.* at 1052, 1056. Because *Rutledge* was not a case where the employee denied having committed the terminable offense, the court did not discuss the issue concerning us—whether, in a disputed case, the jury is to determine if the employee actually committed the offense, or merely if the company reasonably believed he did.

All the same, the majority finds in *Rutledge* a single stray remark that, if read a certain way, might conceivably support the definition of just cause the majority believes is correct. *See* Majority at 194. To the extent it chooses to rely on stray remarks, though, the majority could as easily have quoted another passage; only two sentences earlier, *Rutledge* contains the following statement: "All of the testimony and correspondence regarding Rutledge's termination indicates that Alyeska discharged him because *it determined* that Rutledge was the instigator in the altercation." *Id.* at 1056 (emphasis added). While Rutledge admitted he was involved in the fight, he vehemently denied having started it; thus, this passage strongly supports the notion that just cause means only that the employer believe the discharged employee committed the bad act. That's the danger of placing too much reliance on stray remarks: both sides can find them just as easily. The better approach, it seems to me, is to admit that *Rutledge* doesn't address the scope of the jury's inquiry in disputed cases. No Alaska case does.

The majority cites a second case in support of its position, *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980). Unlike *Rutledge*, *Toussaint* does share the majority's view of just cause; it does nothing, however, to advance the majority's argument as to the clarity of Alaska law. First and most fundamentally, *Toussaint* is not an Alaska case; it's from Michigan. It has been cited by Alaska courts a few times, but never for the proposition for which the majority relies on it, nor anything remotely close. *Toussaint* is known primarily for its holding that, under Michigan law, the terms of an employee handbook can convert an at-will employment relationship into one requiring just cause. While the case discusses peripherally the role of the jury in determining whether there was just cause, this is not the heart of the case, nor is this the portion that is normally cited. No Alaska court has ever embraced the Michigan court's decision that the factual basis for a discharge decision is to be reviewed by the jury.

In the ten years since it was handed down, *Toussaint* has been cited by Alaska courts on only three occasions. In *Eales v. Tanana Valley Medical–Surgical Group, Inc.*, 663 P.2d 958 (Alaska 1983), the court cited *Toussaint* as support for the proposition that promises not to fire an employee so long as he properly performs his duties can modify an employment contract of indefinite duration. *Id.* at 959–60. Then, in *Rutledge v. Alyeska Pipeline Serv. Co.*, 727 P.2d 1050 (Alaska 1986), the court cited *Toussaint* for two propositions: that an employee manual can modify an employment contract, *id.* at 1056, and that prior disciplinary actions might be relevant to

---

*Bertrand v. Southern Pacific Co.*, 282 F.2d 569, 572 (9th Cir.1960). The leading treatise on federal procedure explains the wisdom of our practice. 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558, at 674–75 (1971).

establishing a breach of the covenant of good faith and fair dealing. *Id.*[9] Most recently, in *Jones v. Central Peninsula General Hosp.*, 779 P.2d 783 (Alaska 1989), the court cited *Toussaint* for the proposition that an employee manual can modify the employment contract, *id.* at 785–88, and that it is a jury question whether plaintiff was fired for the stated reason or, instead, some other motive. *Id.* at 789.[10] To say that the Alaska courts, having cited *Toussaint* for specific, unrelated propositions, are bound to accept as law every jot and tittle in the case is to announce a rule of stare decisis that would surprise most lawyers. The majority's reliance on *Toussaint* as an expression of Alaska law is simply unfounded.

To make the factual basis for all personnel decisions reviewable by a jury is an immensely troubling prospect. Indeed, even the *Toussaint* court equivocated on the issue. On the one hand, it did not want to give employers carte blanche to terminate employees on a whim; on the other, it recognized the danger in robbing management personnel of the flexibility needed in running a business. 292 N.W.2d at 896–97. While the court ultimately came down on the side of jury review, it tacked on a limitation: "While the promise to terminate employment only for cause includes the right to have the employer's decision reviewed, it does not include a right to be discharged only with the concurrence of the communal judgment of the jury." *Id.* 292 N.W.2d at 896. Since then, courts applying Michigan law have limited *Toussaint* by circumscribing the jury's role. *See, e.g., Boynton v. TRW, Inc.*, 858 F.2d 1178, 1182 (6th Cir.1988) (decision to discharge as part of economically motivated reduction in work force not reviewable by jury for "just cause"); *Joumas v. Maryland Casualty Co.*, 698 F.Supp. 675, 678–79 (E.D.Mich.1988) (same); *Parker v. Diamond Crystal Salt Co.*, 683 F.Supp. 168, 172–73 (W.D.Mich.1988) (same); *Fischhaber v. General Motors Corp.*, 174 Mich. App. 450, 436 N.W.2d 386, 389 (1988) (rejecting plaintiff's claim that jury must decide whether he was constructively discharged without just cause by means of demotion), *app. denied*, 432 Mich. 902 (1989).

Given that Alaska courts have never addressed this precise issue in a published opinion, there is no principled reason for imposing the rule of *Toussaint* on this case. It is clear from the jury instructions that the trial did not proceed under this theory. Even if our circuit had a plain error rule that would permit us to rewrite instructions that grossly misstate the relevant law, there is simply no indication that the definition of just cause read to the jury misstated Alaska law.

If, on the other hand, we adopt the *Toussaint* rule, state and federal courts will soon be in the business of reviewing employment discharge decisions on a wholesale basis. Given the number of jobs where, *arguably*, the employer has adopted a just cause requirement, the courts will become Merit Systems Protection Boards for all private employment relationships. I think we ought not impose that burden on Alaska courts—and Alaska businesses—lightly, particularly in the absence of definitive guidance from the state supreme

---

**9.** Even the majority concedes that, although *Rutledge* cited *Toussaint,* it did so "on other grounds." Majority at 194.

**10.** The employer's motive for discharging the employee is the central jury question in virtually every wrongful termination case. Indeed, every Alaska wrongful termination case I've come across has involved a claim that the discharge stemmed from an improper motive, not that the employee did not actually commit the suspected offense. *See, e.g., Arco Alaska, Inc. v. Akers,* 753 P.2d 1150, 1154–55 (Alaska 1988) (alleging personal animosity); *Klondike Indus.*

*v. Gibson,* 741 P.2d 1161, 1164, 1167–68 (Alaska 1987) (alleging desire to avoid paying contractual bonus); *Rutledge,* 727 P.2d at 1056 (alleging reverse race discrimination); *S.B. Mitford v. de Lasala,* 666 P.2d 1000, 1007 (Alaska 1983) (alleging desire to prevent sharing future profits).

Plaintiffs here failed to allege any ulterior motive. Their case rested entirely on "objective evidence" from which they hoped the jury would infer some kind of wrongful motive. *See* pp. 207–09 & n. 4 *supra.* As I read the law, their failure to suggest even the slightest ulterior motive should have precluded them from reaching the jury at all.

court.[11]

## III. Public Policy

The majority acknowledges that Parker's drug ban finds strong support in public policy, *see* Majority at 193, 194–95, but fails to adequately consider the impact of its decision on that policy. In this, I believe, the majority falls short. In imposing on Alaska courts a new standard for what constitutes just cause, this court ought not shut its eyes to the factual context in which the case arises. We ignore the decision's effect on safety and related public policy issues at our peril.

A. In upholding the constitutionality of post-accident drug testing of railroad employees, the Supreme Court recently point-

**11.** In a spirited display of hyperbolic exuberance, my concurring colleague suggests this approach would lead to "a significant reversal of our national labor policy." Concurrence at 196. These concerns are wide of the mark. We are not dealing with rights explicitly spelled out in a collective bargaining agreement which carries with it mutually agreed-upon procedures for resolving labor disputes. Rather, we deal here with judicially created rights and remedies which by their nature require judicial enforcement. There is a significant difference between the two.

Collective bargaining agreements, negotiated by union representatives for the benefit of all employees, provide for swift and inexpensive resolution of disputes such as these by way of grievance and arbitration. Moreover, consistent with their duty of fair representation, union officials must promote the interests of all employees, including those whose life and limb might be jeopardized by the misconduct of their colleagues. Judicial proceedings, by contrast, are expensive and protracted, with litigation costs amounting to 80% of the average total recovery in settled cases and 130% in cases that go to trial. *See* Note, *Employer Opportunism and the Need for a Just Cause Standard,* 103 Harv.L.Rev. 510, 525–28 & nn. 70–71 (1989). They require the courts to second-guess management decisions made years earlier; they largely ignore the legitimate interests of others, including those of fellow workers who may be affected by the decision.

The well-defined body of labor law to which my colleague refers would not be affected in the least by a contrary decision today. To say it is very bad policy to have twelve randomly selected men and women second-guess good-faith, honest judgments made by management personnel acting out of genuine concern for worker safety, is not to trumpet a "counter-revolution against worker's rights." Concurrence at 8443. I certainly don't suggest that courts should refuse to apply the terms of a written contract, such as a collective bargaining agreement, which calls for review of an employer's decision to remove employees for cause. Parties should be free to bargain about the terms of employment and courts should enforce those contracts, regardless of their perception of what is good policy. *See, e.g., United Food & Comm'l Workers Union v. Lucky Stores, Inc.,* 806 F.2d 1385, 1386 (9th Cir.1986) ("Wise or not, a deal is a deal.") However, when the contract is unwritten, and often unspoken, the court must fill in the terms. In so doing, it is entirely appropriate to consider the public policy implications of particular rules of decision, including the effect upon safety in the workplace. *See Pugh v. See's Candies, Inc.,* 116 Cal.App.3d 311, 330, 171 Cal. Rptr. 917, 928 (1981) (just cause as an implied contractual term differs greatly from the standard applicable to contracts for a specified term of employment; where the employee occupies a sensitive position the employer must be allowed to exercise her subjective judgment). There is nothing at all revolutionary about this approach. *See Rulon–Miller v. IBM,* 162 Cal. App.3d 241, 253, 208 Cal.Rptr. 524 (1984) ("[A]n employer who acts in good faith on an honest but mistaken belief that discharge of an employee is required by legitimate business interests has not committed a wrongful discharge...."); *Khanna v. Microdata Corp.,* 170 Cal.App.3d 250, 263, 215 Cal.Rptr. 860, 868 (1985) (suggesting that termination due to "dissatisfaction with services" is the same as "good faith"). No less an advocate of employee rights than Justice Joseph Grodin adopted this position: Just cause, he wrote, connotes "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.... [Where] the employee occupies a sensitive...position, the employer must of necessity be allowed substantial scope for the exercise of *subjective* judgment." *Pugh,* 116 Cal.App.3d at 330, 171 Cal. Rptr. at 928 (internal quotes and citations omitted; emphasis added). This is precisely the view of the law adopted by both parties and the district court below. *See* pp. 207–209 *supra.*

My distinguished colleague's concern for the rights of working men and women is well known and entirely justified. We do not disagree as to ends, only as to means. In my view, the interest of everyone involved would have been better served had this dispute arisen in the context of a collective bargaining agreement, which would have provided an effective mechanism for dealing with the issues presented. I fear, however, that decisions such as these ill-serve the cause of voluntary unionization, shifting to the courts an increasing number of labor disputes that have traditionally been handled by union-sponsored grievance procedures. While it is difficult to judge such matters, I suspect that a significant cause of the recent trend away from union membership may be the availability of judicial remedies that give employees the same—and sometimes superior—rights as those available under a collective bargaining agreement.

ed to the frightening statistics linking substance abuse to work-related accidents. *Skinner v. Railway Labor Execs. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 1407–08 & n. 1, 103 L.Ed.2d 639 (1989).[12] Oil rig accidents are no less serious or frequent than train wrecks. Working on a rig has been called "one of the most arduous and risky jobs in the world" and "a daily gamble with death." Associated Press (AP), March 28, 1980. And with good reason: There have been at least 141 major oil rig accidents since the mid–1950s. United Press Int'l (UPI), Oct. 30, 1982. In 1983, a rig capsized in the China Sea, killing 81 workers. AP, May 21, 1985. In 1980, the Alexander Kielland capsized off the coast of Norway, taking 123 lives. AP, Feb. 16, 1982. And in 1979, a rig blow-out in Mexico's Gulf of Campeche created an oil spill that lasted 10 months and released 140 million gallons of oil, more than 12 times the amount released by the Exxon Valdez. N.Y. Times, June 17, 1980, at B7, col. 6.[13] These major catastrophes are in addition to the countless smaller accidents which, according to a 1981 International Labour Organization report, claim 250 to 500 lives annually. Reuters North European Service, Dec. 3, 1981.[14]

Drug or alcohol abuse by oil rig workers magnifies tremendously the job's inherent dangers. As the Supreme Court of Alaska noted recently, "marijuana can impair a person's ability to function normally.... [And] work on an oil rig can be very dangerous." *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123, 1136 (Alaska 1989) (citing cases involving deaths and debilitating injuries resulting from oil rig accidents). But this matter-of-fact statement does not adequately describe the dire con-

sequences that can flow from even a momentary lapse in concentration. For example, on February 6, 1982, a worker on the rig Ocean Ranger was not paying attention and pushed the wrong button, inadvertently letting water into the ballast tank that helped keep the rig afloat. The Ocean Ranger listed five degrees as a result, triggering alarm bells. It was a minor emergency but not considered all that serious at the time: just a mistake. Ten days later, the Ocean Ranger capsized and sank without a trace; all 84 men aboard were lost. Reuters, Feb. 17, 1982. The rig sank because water splashed on the ballast control console from broken portlights, causing an electrical malfunction. National Trans. Safety Bd., *Marine Accident Report: Capsizing and Sinking of the U.S. Mobile Offshore Drilling Unit Ocean Ranger on February 15, 1982,* No. NTSB–MAR–83–2, at 75. While it could not be conclusively established what caused the portlights to break, *id.* at 76, there was suspicion that the "wrong button" incident 10 days earlier was responsible. *See* AP, Mar. 22, 1982. It is fair to say, then, that oil rig employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner,* 109 S.Ct. at 1419.

In the face of these weighty considerations, the United States Supreme Court and the Supreme Court of Alaska alike have approved the use of highly intrusive measures for assuring that drugs and alcohol are not used by people responsible for the lives and safety of themselves and others. In two cases decided on the same day, *Skinner v. Railway Labor Execs. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656,

12. Forty-five train accidents in eight years have been directly attributed to employees under the influence of drugs or alcohol. *Skinner,* 109 S.Ct. at 1408. No less alarming are the statistics involving ships and planes. Drug or alcohol abuse has been linked to no fewer than 50 commercial shipping accidents in a five-year period. L.A. Daily Journal, May 17, 1989, at 6, col. 3. And, in Florida alone, more than 6400 pilots failed to disclose drug and alcohol-related arrests when applying for their licenses. *Id.*

13. Also, at least 70 crewmen were killed when a Chinese rig toppled into the Bo Hai Gulf in

1979. UPI, Feb. 16, 1982. In this country, few have forgotten the disastrous 1969 blow-out of a rig off the California coast, releasing 2 million gallons of oil into the Santa Barbara channel. N.Y. Times, Oct. 27, 1985, at L26, col. 1; AP, Apr. 23, 1977.

14. I am aware that the oil rig here was on Alaska's North Slope, not at sea. But the standards we set today will apply to all oil rigs, whether on land or sea, and to all other dangerous instrumentalities. Parker Drilling, for example, has crews working oil platforms in Cook Inlet.

109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the United States Supreme Court upheld drug and alcohol testing of private railroad employees and U.S. Customs Service employees.

Particularly relevant to our case, the Supreme Court of Alaska recently approved random drug testing of employees who operate oil rigs. *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123 (Alaska 1989). As had the United States Supreme Court, Alaska's highest court acknowledged that such testing amounted to a serious intrusion into the privacy of the affected employees, as to most of whom, presumably, there would not be the slightest suspicion. Nevertheless, the court concluded that safety concerns justified the intrusion. In fact, *Luedtke* held that oil rig operators could inquire even into their employees' off-the-job activities: "Where the public policy supporting the [employees'] privacy in off-duty activities conflicts with the public policy supporting the protection of the health and safety of other workers, and even [these employees] themselves, the health and safety concerns are paramount." 768 P.2d at 1136.

Straining the law to affirm the substantial award to the employees in this case cannot be squared with the rulings of our Supreme Court and, more importantly, with those of the supreme court of the state whose law we apply here. At a time when concerns about safety and drug-related accidents are being used to justify wholesale abrogation of the privacy rights of employees about whom there is absolutely no suspicion, the majority sustains a substantial award of damages to employees who were identified as drug users by no fewer than three of their co-workers, including one who risked termination himself by admitting he had joined plaintiffs in using drugs on the job. *See* n. 2 *supra*.

While we are properly reluctant to overturn jury verdicts, a meaningful degree of judicial oversight is required where important public safety concerns are implicated. Even in the context of labor arbitration awards, where judicial review is normally precluded, a narrow exception has been carved out for awards that run afoul of "well defined and dominant" public policies. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 374, 98 L.Ed.2d 286 (1987) (internal quotations omitted). Accordingly, courts have struck down awards reinstating a pilot who flew a commercial passenger plane while drunk, *Delta Air Lines v. Air Line Pilots Ass'n*, 861 F.2d 665, 666–68 (11th Cir.1988); a truckdriver whose drinking on duty and speeding may have caused his eighteen-wheel rig to overturn, *Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122, 123–24 (5th Cir.1983); and a power company employee responsible for checking various meters and gauges to ensure that high pressure equipment did not overheat, who turned out to be a chronic drug user, *Georgia Power Co. v. IBEW, Local 84*, 707 F.Supp. 531, 533–34 (N.D.Ga. 1989), *aff'd*, 896 F.2d 507 (11th Cir.1990). Similar considerations of public safety should cause us to reverse a jury verdict where, as here, it is clear that management acted entirely in good faith and with no motive other than to assure safety in the workplace.[15]

Neither *Rutledge* nor *Toussaint*, the two cases on which the majority relies for its new standard, nor any other case of which I am aware, deals with a situation where public safety was so directly implicated. The plaintiff in *Rutledge* was a night shift employee; he got into a scuffle with a co-worker about whether or not to leave a window open so that one of the men could smoke. 727 P.2d at 1052. Neither man was seriously hurt and no one else was put in danger by their activities. The plaintiff

---

**15.** The concurrence does much breast-beating about how these plaintiffs are innocent, going so far as to suggest that, were we to uphold their dismissal, we would next be bound to let the government imprison people at will. Concurrence at 202 & n. 13. The fact is, we don't know whether plaintiffs are guilty. Contrary to my colleague's assertion, *id.* at 202, the jury was not instructed to base its verdict on whether plaintiffs were guilty of misconduct but on whether the defendant acted in good faith in dismissing them. The whole case was tried on the theory that plaintiffs were treated disparately from other employees and both sides admitted that the case did not turn on whether the plaintiffs in fact smoked marijuana but on Parker's good faith. *See* pp. 207–09 & n. 4 *supra*.

in *Toussaint* was a paper-pusher; he administered Blue Cross's fleet of company cars. He was fired because people complained, inter alia, that his odometer readings were inaccurate. 292 N.W.2d at 897 n. 39, 902–03. Hardly weighty stuff. No one would have been endangered had Blue Cross engaged in more extensive investigation of these complaints before letting the axe fall.

Plaintiffs in our case, by contrast, were engaged in work so dangerous that a single slip could easily kill a co-worker or unleash an environmental catastrophe. In spite of this, Parker Drilling obtained no fewer than three eyewitness reports that plaintiffs were using drugs on the job before firing them. To wait any longer or look any closer would have been reckless; the dangers being what they were, the company had no responsible choice but to act decisively. By affirming the jury verdict against Parker, we are saying that management erred grievously by failing to send the employees back onto the oil rig after receiving three eyewitness reports that they were observed regularly abusing drugs on the job, and that the company must now pay hundreds of thousands of dollars for its mistake.

This strikes me as a result so preposterous it would be laughable if it were not so scary. Is this the type of decision we want to take out of the hands of management and give to a jury? Is it fair (or safe) to put company officials to a choice between risking an environmental catastrophe and a crushing jury verdict? It seems to me that the most we can reasonably ask

of managers under these difficult circumstances is that they act responsibly and in good faith. Whatever may be the rule when dealing with employees who are not in safety-sensitive positions, it seems to me that substantial deference is owed to managers who discharge employees out of a legitimate, good-faith belief that they are acting to preserve life, limb, property and the environment.[16]

The record here discloses in chilling detail that drug abuse on oil rigs was not an imaginary problem for Parker Drilling. In 1982, company officials investigated rumors of drug abuse on some of its platforms in Cook Inlet. Because no eyewitness would come forward to finger the drug users, the company had to resort to a surprise drug raid which included a drug-sniffing dog and unannounced searches of employees' personal quarters. The searches, conducted in a single afternoon, yielded a small mountain of drugs; at least 10 drug stashes—ranging from marijuana and amphetamines to cocaine and LSD—were discovered. Yet Parker could do little to rid itself of the offending employees. While 14 employees were implicated, only two were fired; two others were issued warnings. The reason was simple: Because employees on the platform shared living quarters, it was virtually impossible to identify the owner of a particular drug stash.[17]

If we are going to read the rule of *Toussaint* into Alaska law, therefore, we should temper it by including a public policy exception that takes into account the practical realities of running a dangerous business.[18]

---

**16.** The good faith standard is not, as the concurrence would have it, "an almost meaningless concept." Concurrence at 196. It protects the employee from being dismissed based on personal animosity, ill will and any other ulterior motive; and it requires the employer to conduct a reasonable investigation of the alleged safety violation.

**17.** The undisputed testimony of John Haynes, who conducted the raid, explains the difficulties of disciplining employees whom eyewitnesses have not identified as drug users:

We did not find any marijuana in anybody's possession. We did find marijuana in several drawers. There are four people bunking in one room, and they have one common dresser that they use. So, it was very difficult to link

the marijuana to one person. We did find some personal belongings in one drawer with marijuana, but I didn't think it was sufficient evidence to terminate the person for that; so we just gave him a warning slip.

RT 2:227–28. The proof problems were so severe that one employee who was initially discharged was able to convince the company to reduce his punishment to a warning, even though four drug stashes were discovered in his room—in a plastic bag in his closet, in a film canister, in a chewing tobacco container and in bottles underneath his bed. RT 2:233–35.

**18.** Raising the specter of judicial activism—a concept he no doubt finds anathema—my concurring colleague suggests that a narrow public policy exception for situations involving severe

The fact is, misconduct is especially difficult to prove in such cases. Drug abuse is illegal, as well as contrary to company policy, so employees who use drugs will tend to deny accusations leveled against them. Additionally, the tremendous hazards posed to co-workers by drug use on an oil rig mean that employees using drugs will tend to do so surreptitiously, attempting to conceal their dangerous habit from those they work with. We should not require company officials to catch employees with a lit joint hanging from their lips before they can dismiss them for misconduct. *See* Note, *Employer Opportunism and the Need for a Just Cause Standard, supra* p. 212 n. 11, at 525–29.

Failure to recognize and allow for these difficult problems of proof will bring us again and again to a situation where an employer has very compelling reasons for believing employees are engaged in on-the-job drug abuse, yet the employees manage to prevail before a jury on the basis of paper-thin evidence that the employer's suspicions were unfounded. Here, for example, plaintiffs relied entirely on their own self-serving denials, coupled with the testimony of three rig employees who never personally observed them smoking pot on the job. *See* Majority at 198–99. Is management required to have a signed confession, or an eyewitness report from *every* co-worker before it can feel confident in discharging drug abusing employees? To ask that management wait until it has more proof than Parker had against Cantu, Howard and Sanders before pulling an employee off an oil rig—or a nuclear power plant, for that matter—is to beckon disaster.

B. But the cause of public safety is not the only one that takes a beating as a result of today's ruling; so does that of employee privacy. We are presented here with that admirable but all too rare a creature: an employer who took seriously its responsibility to assure safety in the workplace, but who approached the task in a responsible and non-hysterical fashion, cognizant of the need to be fair to its employees and respectful of their privacy. While Parker Drilling banned all drugs and alcohol from its rigs, it did not attempt to control its employees' activities when they were on leave, as it could well have done under Alaska law.[19]

risk to life, property or the environment would amount to "judicial legislation." Concurrence at 8452. What he fails to appreciate is that this entire area of Alaskan law is judge-made; case-law, not statutes, set forth all the governing principles. To the extent the courts have established the applicable rules, it is up to the courts to also announce the limiting principles. It is a well-established tradition of our jurisprudence that, in the absence of statute or custom, we must decide as if we were legislators. B. Cardozo, The Judicial Process 140 (1921); *see also* O.W. Holmes, The Common Law 35–36 (1881). In so doing however, we should not let sound judgment yield to "spasmodic sentiments." Cardozo, *supra,* at 141. Call it common law or common sense, if there is a judicially created rule that allows juries to second guess all employee terminations, there ought to be a judicially created exception for situations where the employer moves quickly and in good faith to ensure the safety of its employees.

Workers may not all agree with the concurrence that "job security is the most fundamental employment right," concurrence at 197; some may consider the right to a safe work environment at least as important. Where there is a collective bargaining agreement, we need not worry about the employees' preferences: Their needs and those of management will be reflected in the negotiated agreement; we can trust the parties to know what is in their interest and how to achieve it. However, when we are called upon to fill in the terms of a contract never reduced to writing, we must account for the interests of all those who would have input into and be affected by it. *See* n. 11 *supra.* Much as my concurring colleague would have it be otherwise, the more difficult we make it for employers to get rid of employees whom they reasonably and honestly believe are using drugs on the job, the more likely it is that employees who in fact use drugs will be sent back to safety-sensitive positions. The inattentiveness of a drug-impaired worker could convert Judge Reinhardt's rhetorical "off with the worker's head," concurrence at 202, into gruesome reality.

19. Parker certainly paid the price for its respect of personal privacy. As explained above, *see* p. 206 *supra,* plaintiffs were on leave when the company first learned of the drug allegations. Because company policy did not prohibit drug use while on leave, drug testing the employees as they were returning to the rig would have been pointless. Parker thus faced a hard choice between sending the men back to the rig and risking a disaster, and discharging them and risking a jury verdict. Clearly, Parker would have been better off prohibiting all drug use, on and off the job, and testing plaintiffs as soon as suspicion arose. For failing to adopt this draconian solution, Parker is now left holding the dirty end of the stick.

Even as to on-duty employees, Parker did not conduct wholesale drug testing or routine patrols with drug-sniffing dogs; rather, it acted primarily in response to reported violations. Employees found with drugs in their rooms, even in their dresser drawers, were not automatically fired; the company recognized that the drugs could have been stashed there by a roommate. When the company learned that plaintiffs were using drugs, the decision whether to take disciplinary action was not left to their immediate supervisors who might have been swayed by personal animus; the task was assumed by top management personnel, who everyone agrees were strangers to the accused employees prior to the incident. These high-level managers had received two eyewitness reports incriminating plaintiffs, yet, in an abundance of caution and fairness, they sought further corroboration. Only after obtaining a third eyewitness verification did management discharge plaintiffs.

If one were writing a manual describing how an ideal employer ought to behave under these difficult circumstances, one could hardly do better than to list the steps taken by Parker Drilling in this case. Employers are now free under Alaska and federal law to adopt far more oppressive measures to discourage substance abuse by employees who operate oil rigs and other dangerous instrumentalities. One nevertheless hopes that employers will not take full advantage of that freedom, but will approach the task of assuring safety in a more restrained and responsible fashion, much as Parker Drilling did here.

Our hopes may be in vain. Decisions like the majority's have already encouraged employers to abandon less intrusive means of ensuring a drug-free workplace. Supervisors are becoming increasingly unwilling to

risk mistakenly singling out workers for "for-cause" drug-testing. *See* Motorola Aims High, So Motorolans Won't Be Getting High, Wall St. J., June 26, 1990, at A17, col. 3, 4. So what do employers do? They institute mandatory drug testing for all employees—even in the absence of safety concerns—seriously invading the privacy of all their employees. *Id.* For the right to have a jury second-guess management's termination decisions, my colleagues trade away not only the workers' safety but their privacy and dignity as well. This, to me, is too high a price.[20]

C. If today's morality tale teaches anything, it is the wisdom of the aphorism: nice guys finish last. For its trouble, Parker Drilling is rewarded with a bill for $360,107, years of litigation and a truckload of attorney time sheets. The moral of this story will not be lost on other, similarly situated, employers.

Ideas have consequences and the ideas embodied in judicial opinions have very direct and immediate consequences. I suspect two things will happen. First, employers will be discouraged from discharging employees suspected of drug use. Absent concrete evidence—a positive urinalysis test or a signed confession—employers may well feel constrained to send employees observed using drugs back to work. The clear lesson of this case is that, unless the employee is caught red-handed by someone with authority to fire him, he can always manufacture a triable issue of fact by finding a few co-workers who never saw him using drugs, inventing some threat, or whatnot. And if a jury buys into the story, the courts will cheerfully uphold the award, no matter how little sense it makes in light of the record as a whole. It is difficult to say how many drug abusers will be permitted to remain on the job by litigation-timid

---

**20.** Judge Trott suggests that random drug testing might be less intrusive than investigating individuals about whom there is suspicion. Majority at 195 n. 3. I can only wonder what kind of nation we would live in if the Framers had concluded that random invasions of our privacy were less troublesome than those based on probable cause or reasonable suspicion. Judge

Reinhardt's apparent agreement with me on this point, *see* concurrence at 196 n. 1, is cold comfort. Railing about the need for "a greater sense of commitment to the fundamental constitutional principles," concurrence at 196 n. 1, does little to help the cause of worker privacy which, as a consequence of today's decision, suffers another body blow.

managers, but there will surely be some.[21] Consider, for example, how gun-shy Parker Drilling officials might be if tomorrow they were to hear a reliable report that a particular employee on one of their oil platforms in Cook Inlet had been observed smoking a joint. Knowing that drug use on an oil platform at sea creates substantial risks to public safety and the environment, do we really want to encourage Parker and similarly situated employers to send suspected drug abusers back to work until they get caught lighting up?

The second and more direct effect of today's decision is to tell employers they had better adopt draconian measures to screen employees for drug abuse. What Alaska employer, on reading this decision, would continue to ban drugs only in the workplace, as Parker did? Having received the green light from the Supreme Court of Alaska to extend this ban to employees between shifts and on leave, and having seen the trouble Parker got into by having failed to do so, *see* n. 19 *supra*, an employer would be foolish to impose a drug and alcohol ban less broad than the law allows. And, what employer would be dumb enough to rely on mere eyewitness testimony in any future discharges? Even if an appellate court eventually vindicates the employer, the litigation expense makes the process uneconomical. Instead, companies involved in safety-sensitive activities—those that operate planes, trains, boats, manufacturing plants and thousands of other hazardous activities—will have to seriously consider instituting procedures that routinely and indiscriminately trample the privacy of their employees. Invasive and unpleasant though they may be, these methods are effectively jury-proof. The judgment we affirm today will thus be paid for dearly by thousands of employees engaged in high risk enterprises, whose employers will steer clear of the mistakes made by Parker Drilling. Urinalysis machines, drug-sniffing dogs, surprise locker inspections and whole body searches will become the way of life in the American workplace. Is this really the world we want to live in?

### Conclusion

The jury system is a wonderful thing. Born of the English common law, it stands as a tribute to democratic government and a bulwark against tyranny. But juries can function effectively only under close judicial supervision. Jurors are people and people make mistakes. Total deference to jury verdicts can occasionally be as oppressive as the denial of the right to jury trial. The jury in this case reached a verdict that has no support in the record; rather than overturn the verdict, though, the majority chooses to sidestep the law of the case and to allow plaintiffs to prevail on the strength of an argument they never raised.

The court has a responsibility to overturn a verdict not supported by the record. That responsibility is particularly grave in a case such as this where timely and fundamental issues of public policy are at stake: on the one hand, the need for safety; on the other, the responsibility to avoid gratuitous invasions of personal privacy. Because I fear my colleagues today have failed in this responsibility by upholding a verdict that is clearly erroneous and by ignoring the likely consequences of this action, I must respectfully part company with them.

**21.** Of course, even those employers who are reluctant to fire employees who endanger themselves and others may find themselves in court. By not discharging an employee he reasonably believes is using drugs, the employer may be opening himself to criminal sanctions, *see People v. Hegedus*, 432 Mich. 598, 443 N.W.2d 127 (1989); *People v. Chicago Magnet Wire Corp.*, 126 Ill.2d 356, 128 Ill.Dec. 517, 534 N.E.2d 962 (1989), *cert. denied sub nom. Asta v. Illinois*, —— U.S. ——, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989), not to mention wrongful death lawsuits, if that employee makes a mistake that gets someone killed.