BRIAN W. MEEHAN, Plaintiff v. AMERICAN MEDIA INTERNATIONAL, LLC; DNA SECURITY, INC.; and RICHARD CLARK, Defendants

No. COA10-1091

(Filed 2 August 2011)

**1. Employer and Employee—breach of employment—conduct grounds for termination—reasons not pretextual—summary judgment proper**

The trial court did not err in a breach of employment contract case by granting defendants' motion for summary judgment. There were no genuine issues of material fact as to whether plaintiff engaged in conduct that met the employment agreement's grounds for termination and given the just cause for termination, defendant's reasons for plaintiff's discharge were not pretextual.

**2. Employer and Employee—tortious interference with contract—no intentional inducement—summary judgment proper**

The trial court did not err in a tortious interference with contract case by granting defendants' motion for summary judgment. Defendant DSI did not breach its contract with plaintiff because it had just cause for termination. Since there was no breach of

contract, plaintiff's claim failed. Additionally, as just cause for termination existed, defendants Clark and AMI had legal justification for discharging plaintiff.

**3. Employer and Employee—employment contracts—Wage and Hour Act—terms ambiguous—genuine issues of material fact—summary judgment improper**

The trial court erred in a North Carolina Wage and Hour Act claim by granting defendants' motion for summary judgment. The language of the employment contract was ambiguous and genuine issues of material fact existed as to which iteration of the Consumer Price Index should be used.

Appeal by Plaintiff from an Order entered 26 March 2010 by Judge J.B. Allen, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 10 March 2011.

*Elliot Pishko Morgan, P.A., by Robert M. Elliot, for Plaintiff-appellant.*

*Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Robert A. Sar, Gretchen W. Ewalt, and Phillip J. Strach, for Defendants-appellee.*

HUNTER, JR., Robert N., Judge.

Brian W. Meehan ("Plaintiff") appeals from an Order granting Defendants' Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. We affirm in part, and vacate and remand in part.

## I. Facts and Procedural History

This case arises from a dispute between Plaintiff and his former employer, DNA Security, Inc. ("DSI"). In 2006, Plaintiff prepared a report analyzing DNA samples in connection with the Durham Police Department's investigation of 46 Duke University lacrosse players on sexual assault allegations (the "Duke Lacrosse Case"). The report obscured findings that exculpated the charged players, and in the controversy that followed, DSI terminated Plaintiff's employment. Plaintiff contends DSI did not have just cause for termination and filed the underlying action against DSI, American Media International, LLC ("AMI"), and Richard Clark ("Clark") (collectively "Defendants").

MEEHAN v. AM. MEDIA INT'L, LLC

[214 N.C. App. 245 (2011)]

Plaintiff, who has a Ph.D. in Marine Science, is a scientist specializing in DNA analysis and testing. In 1998, Plaintiff established and incorporated DSI as a company providing DNA forensic analysis in North Carolina and began marketing its services to sheriffs, police departments, and district attorneys. In order to be recognized by police and prosecutorial authorities as a qualified testing lab, DSI had to obtain the "gold standard" of accreditation from the American Society of Crime Laboratory Directors ("ASCLD/LAB"). To meet ASCLD/LAB accrediting standards, DSI had to prepare and submit its procedures and protocols to ASCLD/LAB to assure ASCLD/LAB that DSI test results and reports would meet required standards of accuracy and reliability. DSI obtained ASCLD/LAB certification in 2003.

On 27 October 2004, Plaintiff, then the sole director, officer, and shareholder of DSI, and Clark, President of AMI, executed a stock purchase agreement under which AMI would purchase all the stock of DSI and Plaintiff would remain employed by DSI for seven years pursuant to a term sheet appended to the stock purchase agreement ("Employment Agreement").

The Employment Agreement contained four sections relevant to this appeal as follows:

5. Initial Salary: One Hundred Twenty Five Thousand Dollars ($125,000.00) per year payable in equal monthly installments.

6. Salary Adjustments: The salary shall be adjusted annually to, at least, reflect any percentage increase in the Consumer Price Index (all items) as calculated by the United States Bureau of Labor Statistics. There shall be no salary adjustment downward in any year in which the Consumer Price Index might decrease from the previous year.

7. Employment Position and Responsibilities: Employer shall engage and hire Employee for the position of Executive Director and Employee shall perform such duties as are customary by one holding such a position in a similar business or enterprise.

. . . .

11. Termination of Employment:

. . . .

b. Employment shall terminate for just cause, including any violation of policies and procedures listed in the [DSI] employee handbook, or any terms of this agreement, or in the event the

employee is convicted of a crime of moral turpitude or dishonesty. In any of these events of termination, [DSI] shall be obligated to pay Employee only such compensation as is due and payable through the date of termination.

At the time of the agreement, DSI had an employee handbook, referenced in Section 11(b) of the Employment Agreement, which provided standards of conduct that Defendants assert support a contractual basis for Plaintiff's termination. The relevant portion of this employee handbook reads as follows:

5.2 <u>Rules of Conduct</u>: . . . Although not all-inclusive, any of the following types of misconduct are considered unacceptable behavior and will result in disciplinary action up to and including immediate discharge.

. . . .

(17) Substandard performance on the job.

. . . .

The absence of any misconduct not listed above does not prevent its being considered a breach of our rules of conduct. If your appearance, performance, work habits, overall attitude, conduct, or demeanor become unsatisfactory in the judgment of the Company, based on violations either of the above or any other Company policies, rules or regulations, you may be subject to disciplinary action, up to and including dismissal.

From the execution of the stock purchase agreement until the time of the events described hereinafter, the parties' relationship appeared to be harmonious.

In the spring of 2006, the Durham Police Department requested DSI to conduct DNA analysis in connection with the Duke Lacrosse Case. After Plaintiff agreed to conduct the testing, the State obtained a Court Order dated 5 April 2006 from Judge Ronald L. Stephens ordering:

the oral, anal, vaginal and underwear swabs taken from the victim's rape kit in this case, along with the 46 cheek swabbings taken from the group containing the suspects, be delivered to [DSI] . . . for the purpose of Y STR DNA analysis, and if any male positive results are found among the victim's swabs, to compare the DNA to the 46 cheek swabbings to determine if an identification can be made.

Over the next two months, DSI staff, supervised by Plaintiff, completed the requested analysis. The test results supported two conclusions: (1) there was no match between any of the specimens provided by the lacrosse players and the alleged victim; and (2) the alleged victim had recent sexual contact with multiple men who were not among the specimens provided.

Plaintiff, by affidavit, testified that in April 2006 he verbally conveyed both conclusions of the test results to District Attorney Mike Nifong ("Nifong") and subsequently authored and signed a written report to Nifong dated 12 May 2006 providing the results of the analysis (the "12 May 2006 Report"). Plaintiff admits he is responsible for the creation of the 12 May 2006 Report and the report was his work product.

While the 12 May 2006 Report can, in theory, be read to support the first conclusion of the analysis (that there was no match between any of the specimens provided by the accused and the accuser), the language used to convey both of Plaintiff's conclusions is vague. Instead of explicitly stating both conclusions, Plaintiff used the following opaque language in the 12 May 2006 Report: "Results of DNA analysis: Individual DNA profiles for non-probative evidence specimens and suspect reference specimens are being retained at DSI pending notification of the client. Three of the reference specimens are consistent with DNA profiles obtained from some evidence items and the analysis of these specimens is below." Specifically, Plaintiff's use of the phrase "non-probative" in the 12 May 2006 Report obscured the actual test results. Although the test results exonerate the lacrosse players, subsequent to the State's receipt of the 12 May 2006 Report, three of the 46 lacrosse players, Collin Finnerty, Reade Seligmann, and David Evans (collectively "the charged players"), were indicted by the State for first degree forcible rape, first degree sexual offense, and kidnapping.

In response to discovery motions, the State provided the results of the lab tests to the attorneys representing the charged players in October 2006. On 14 December 2006, Nifong informed Plaintiff that the attorneys representing the charged players made a motion that Plaintiff be tendered as a witness at a hearing scheduled for 15 December 2006. As the author of the 12 May 2006 Report, Plaintiff was encouraged by Nifong and Clark, then President of DSI, to testify as to the report's findings. Plaintiff was reluctant to testify at the hearing and cited that he would not be able to review the "volume of documents" needed for adequate trial preparation in time for his testimony.

Through Plaintiff's testimony at the 15 December 2006 hearing, it became clear that the 12 May 2006 Report was flawed. The following exchange between Plaintiff and an attorney for one of the charged players illustrates the central flaw of the report:

Q. Let me direct your attention to what is exhibit Attachment No. 15 of Defendants' Exhibit No. 1. The bottom number is 3883.

A. I'm there.

Q. Does that appear to be the protocols for your lab—

A. Yes.

Q. —on how you run your lab?

A. Yes.

Q. Do you rely on those protocols routinely to maintain your accreditation with ASCLD/LAB?

A. Yes.

Q. I'd like to direct your attention to standards for reports. It says, No. 4, item reports shall include . . .

A. I'm there.

Q. Doesn't it say, Results for each DNA test?

A. Yes.

Q. You didn't include the results for each DNA test in your report dated May 12; is that correct?

A. That's correct.

Q. So you violated this protocol of your own lab?

A. That's correct.

Q. And you violated this protocol of your own lab because the district attorney told you to; is that correct?

A. No. It's not just because the district attorney told me to. And, you know, I don't know a better way to say this. You know, we, we legitimately—and it may not hold any weight in your legal arena, but we were legitimately concerned about a report that could become explosive if it had overly detailed all those profiles from all those players in it, okay.

Now, so we agreed with Mr. Nifong that we would report just the stuff that matched so that it would, so the report was limited in its scope. However, it's not a—and by the letter of the law, by the letter of the wording of the standard, you're absolutely correct. It diverges from the letter of that standard, okay. But we do indicate on the report that there is additional information. We would be glad to provide this information if you would like.

But at this point on this report, it was limited. This, I don't have another explanation for it.

. . . .

I don't have a legal justification for it or a reason, okay. It was just trying to do the right thing. And that information is still available and it was available to you when we released the full documents.

. . . .

Q. Okay. Were [the prosecuting attorneys] aware that all the testing that you had done excluded Reade Seligmann with a hundred percent scientific certainty as of the date you wrote your report?

A. I believe so.

Q. Did you have a specific discussion with them about whether that information excluding Reade Seligmann should be included in the report?

A. Not with that specific name, No. We never mentioned that specific name.

Q. How about any defendant?

A. We never, I actually don't recall using any defendant's names. . . .

Q. Did your report set forth the results of all of the tests and examinations that you conducted in this case?

A. No. It was limited to only some results.

Q. Okay. And that was an intentional limitation arrived at between you and representatives of the State of North Carolina not to report on the results of all examinations and tests that you did in this case?

A. Yes.

Plaintiff's 15 December 2006 testimony regarding the incomplete 12 May 2006 Report created substantial adverse reactions to DSI in

the news media. The national television news program *60 Minutes* produced a segment on the Duke Lacrosse Case. DSI asked Plaintiff to appear on *60 Minutes* to answer questions from CBS correspondent Leslie Stahl. Plaintiff reluctantly agreed to do so. During the interview, Plaintiff made the following statements:

[Leslie Stahl]: So . . . when you produced other reports if you have found information about other [suspects,] other people who aren't suspects, you would leave it out of the report? Have you done this before?

[Plaintiff]: No. I . . . wouldn't leave it—we haven't done that before, and I wouldn't leave it out.

. . . .

[Leslie Stahl]: [D]id you just completely, totally, you, yourself, take it on yourself, all you, no influence from the District Attorney; and not put every single thing that a lot of other forensic specialists, who we've talked to, say should have been in that report?

[Plaintiff]: It was an error by me.

[Leslie Stahl]: Your error?

[Plaintiff]: It was my error.

[Leslie Stahl]: Not the District Attorney?

[Plaintiff]: No, I'm the person that wrote that report, and—and the District [Attorney] at no time explicitly told me to include, to exclude in that report.

On 10 January 2007, prior to the airing of the *60 Minutes* interview on 11 February 2007, Plaintiff composed an amended laboratory report that corrected the errors in the 12 May 2006 Report. This 10 January 2007 report explicitly stated the DNA evidence provided by Nifong did not match any of the lacrosse players' DNA. After reviewing these events, on 25 July 2007 ASCLD/LAB issued a report confirming the validity of allegations made against DSI concerning its 12 May 2006 Report; ASCLD/LAB asserted DSI inappropriately characterized certain DNA samples as non-probative. ASCLD/LAB also noted that DSI had taken actions to correct the 12 May 2006 Report.

Following the broadcast of the *60 Minutes* interview and other public comments about DSI, Plaintiff's workload and DSI's revenues

declined. Defendants directly attribute this decline to Plaintiff's 12 May 2006 Report. Additionally, the charged players filed a civil action for damages against DSI and Plaintiff, which, according to the record, remains unresolved.

Unbeknownst to Plaintiff, DSI began looking for a new lab director to replace Plaintiff in the spring of 2007. While DSI was securing a replacement lab director, Plaintiff continued to serve as lab director and to testify in various legal proceedings relating to the Duke Lacrosse Case. Plaintiff was scheduled to receive a "milestone" payment of $160,000 in January 2008, if he remained employed until that date, pursuant to the terms of the Employment Agreement.

On 11 October 2007, Clark wrote a letter to Plaintiff terminating his employment for just cause pursuant to clause 11(b) of the Employment Agreement. The letter states, in part:

> While I know for certain that the allegations against you, the company and myself are completely false, your failure to adequately explain DSI's role in this case to the public and to the lacrosse families during the multiple times you have testified has directly lead to the dire situation the company currently faces. Based on our conversations, I also know that you fully understand and acknowledge that your poor communications have put you, DSI and myself in this ridiculous situation.

> This letter will serve as notice that DSI is terminating your employment immediately. Standing alone, your misstatement that you committed an alleged "big error" in the handling of the Duke Lacrosse case, as you characterized it on national television during a 60 Minutes interview, constitutes just cause for ending your employment as Executive Director of the lab pursuant to the Employment Agreement the company entered into with you in October of 2004. As we have discussed many times and you have consistently told me, there in fact was no "big error."

Some months after sending the letter, Defendants sent Plaintiff a check in the amount of $6,554.24, which Defendants contend was the amount due to Plaintiff pursuant to the Employment Agreement, including any salary adjustment due to a rise in the Consumer Price Index ("CPI"). Plaintiff disputes that this is the correct amount owed to him, alleging DSI improperly calculated the amount due under the CPI salary adjustment contract provisions. Plaintiff contends he is due $10,627 for CPI adjustments dating from January 2006.

Plaintiff filed claims for relief against Defendants on 11 August 2008 in Alamance County Superior Court. The Complaint alleges five claims for relief: breach of an employment contract against AMI and DSI, breach of the covenant of good faith and fair dealing against AMI and DSI, violation of the North Carolina Wage and Hour Act against AMI and DSI, tortious interference with contract against AMI and Clark, and conspiracy to engage in wrongful conduct against all of the defendants. Defendants' Answer denied the allegations and asserted 24 affirmative defenses. After thorough discovery, Defendants filed a Motion for Summary Judgment on 12 October 2009 and Plaintiff filed a Motion for Partial Summary Judgment on 9 March 2010 based upon his claim for violation of the North Carolina Wage and Hour Act. Both Motions were supported by extensive affidavits and depositions and were heard before Judge J.B. Allen on 15 March 2010. The trial court denied Plaintiff's Motion and granted Defendants' Motion for Summary Judgment, dismissing all of Plaintiff's claims with prejudice. Plaintiff timely appealed the Order.

## II. Jurisdiction and Standard of Review

This Court has jurisdiction to hear the matter pursuant to N.C. Gen. Stat. § 7A-27(b) (2009). We review the trial court's Order granting summary judgment *de novo*. *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007).

The standard of review for a summary judgment motion is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Oliver v. Roberts*, 49 N.C. App. 311, 314, 271 S.E.2d 399, 401 (1980), *cert. denied*, 276 S.E.2d 283 (1981). "In ruling on the motion, the court must consider the evidence in the light most favorable to the non-movant, who is entitled to the benefit of all favorable inferences which may reasonably be drawn from the facts proffered." *Averitt v. Rozier*, 119 N.C. App. 216, 218, 458 S.E.2d 26, 28 (1995). Summary judgment may be properly shown by a party: " '(1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense.' " *Kinesis Adver., Inc. v. Hill*, 187 N.C. App. 1, 10, 652 S.E.2d 284, 292 (2007) (quoting *Draughon v. Harnett Cty. Bd. of Educ.*, 158 N.C. App. 705, 708, 582 S.E.2d 343, 345 (2003), *aff'd*, 358 N.C. 137, 591 S.E.2d 520 (2004), *reh'g denied*, 358 N.C. 381, 597 S.E.2d 129 (2004)).

MEEHAN v. AM. MEDIA INT'L, LLC

[214 N.C. App. 245 (2011)]

## III. Analysis

On appeal, Plaintiff raises three issues by which he contends the trial court erred in granting Defendants' Motion for Summary Judgment. First, Plaintiff argues that because Defendants have the burden of proof to show just cause for termination, summary judgment is inappropriate where there are disputed issues of material fact regarding Plaintiff's termination. Second, Plaintiff argues that because Defendants were able to calculate the amount of the final check to Plaintiff, their legal position that the CPI provisions are too indefinite to be enforced is compromised, making summary judgment inappropriate. Finally, Plaintiff contends the trial court erred in dismissing his claim for tortious interference with contract because there are disputed issues of fact as to the elements of this tort.

### A. Just Cause for Termination

[1] Plaintiff argues there are genuine issues of material fact to be determined by the jury as to (1) whether the ground stated for Plaintiff's termination constituted just cause; and (2) whether the ground stated was the actual reason for Defendants' action or whether the stated reason was a pretext. We disagree.

In discussing just cause, our Supreme Court has advised that:

> "Just cause," like justice itself, is not susceptible of precise definition. It is a "'flexible concept, embodying notions of equity and fairness,'" that can only be determined upon an examination of the facts and circumstances of each individual case. Thus, not *every* violation of law gives rise to "just cause" for employee discipline.

*N.C. Dept. of Env't and Natural Res. v. Carroll*, 358 N.C. 649, 669, 599 S.E.2d 888, 900-01 (2004) (citations omitted). In *Carroll*, our Supreme Court adopted the approach established in *Sanders v. Parker Drilling Co.*, 911 F.2d 191 (9th Cir. 1990), for determining whether just cause for dismissal exists. *Carroll*, 358 N.C. at 665, 599 S.E.2d at 898. Courts must answer two separate questions: "(1) whether the employee engaged in the conduct the employer alleges; and (2) whether that conduct constitutes just cause for termination of employment." *Sanders*, 911 F.2d at 194 (citing H. Perritt, *Employment Dismissal Laws and Practice* 296 (1st ed. 1984)). *Carroll* informs us that the first question is a question of fact and the second question is a question of law. 358 N.C. at 665-66, 599 S.E.2d at 898. While *Carroll* addresses the termination of a public employee, it draws its legal rea-

soning from *Sanders*, a private employment case, and we thus view the legal reasoning in *Carroll* applicable in a private employment setting.

Our analysis of the issue of just cause depends substantially on our interpretation of relevant language in the Employment Agreement. " 'The controlling purpose of the court in construing a contract is to ascertain the intention of the parties as of the time the contract was made.' " *Hilliard v. Hilliard*, 146 N.C. App. 709, 714, 554 S.E.2d 374, 377–78 (2001) (quoting *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962)). " '[A] contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.' " *Atlantic & N.C.R. Co. v. Atlantic & N.C. Co.*, 147 N.C. 368, 382, 61 S.E. 185, 190 (1908) (emphasis added) (quoting Paige on Contracts, § 1112). " 'If the words employed are capable of more than one meaning, the meaning to be given is that which it is apparent the parties intended them to have.' " *Jones v. Casstevens*, 222 N.C. 411, 413, 23 S.E.2d 303, 305 (1942) (quoting *King v. Davis*, 190 N.C. 737, 741, 130 S.E. 707, 709–10 (1925)).

On 27 October 2004, both Plaintiff and Defendants willingly entered into the Employment Agreement. In the Employment Agreement, the contracting parties agreed that "any violation of policies and procedures listed in the [DSI] employee handbook, or any terms of this agreement" would be a ground for termination. The employee handbook states that "[s]ubstandard performance on the job" is a ground for termination and that "[i]f your appearance, performance, work habits, overall attitude, conduct, or demeanor become unsatisfactory in the judgment of the Company, based on violations either of the above or any other Company policies, rules or regulations, you may be subject to disciplinary action, up to and including dismissal." At trial, Plaintiff explicitly stated that he knowingly violated his company's protocol and procedures.

In accordance with the two-step analysis established in *Carroll*, we must initially determine whether Plaintiff engaged in the conduct alleged by his employer. As *Carroll* indicates, this is a question of fact. 358 N.C. at 665-66, 599 S.E.2d at 898. We conclude that there are no genuine issues of material fact as to whether Plaintiff engaged in conduct that meets the Employment Agreement's grounds for termination.

In reaching this conclusion, we initially examine the context of Plaintiff's omissions of material facts from the 12 May 2006 Report. DSI's success depended on the reliability of its reports and the credi-

bility and truthfulness of its employees. DSI was accredited and enjoyed a favorable business reputation in the law enforcement field largely based on work Plaintiff had undertaken to write a quality control manual and meet the professional scientific standards of ASCLD/LAB. Without Plaintiff's professional credentials, it is unlikely the company would have been accredited or enjoyed financial success. The business success of DSI was largely dependent on the credibility and truthfulness of its employees acting under the supervision of Plaintiff. DSI's business model depended on the reliability of the scientific research and its reports used by courts or law enforcement personnel for determining the probable guilt or likely innocence of those being tested. Plainly, Plaintiff and DSI were engaged in the business of providing professional expert witness testimony and supplying reliable DNA tests. It is within this factual context that we must consider Plaintiff's acts to determine whether Plaintiff engaged in the conduct alleged and whether or not Plaintiff's conduct constitutes just cause for discharge.

Plaintiff personally supervised and conducted DNA testing pursuant to a court order and personally prepared the 12 May 2006 Report. The instructions of the order were clear and precise. The 12 May 2006 Report prepared by Plaintiff obscured the findings of Plaintiff's analysis—that none of the tested lacrosse players' DNA matched the DNA from the specimens found on their accuser. The failure to clearly report these findings was an "error" on the part of Plaintiff. Additionally, despite ambiguity in Plaintiff's trial testimony, Plaintiff asserted on national television that he was not directed by Nifong to obscure these results and was at fault. We determine that by obscuring results in the 12 May 2006 Report, Plaintiff engaged in "substandard performance on the job" as defined by the DSI employee handbook and consequently met the Employment Agreement's grounds for termination.

Next, under the *Carroll* two-part test we must analyze whether Plaintiff's violation of the Employment Agreement constituted just cause for termination of employment as a matter of law. To show just cause, Defendants must prove either that Plaintiff failed to fulfill one or more of the explicit terms of his employment agreement, *McKnight v. Simpson's Beauty Supply, Inc.*, 86 N.C. App. 451, 452-53, 358 S.E.2d 107, 108-09 (1987); failed to serve his employer faithfully and diligently, *Wilson v. McClenny*, 262 N.C. 121, 131, 136 S.E.2d 569, 577 (1964); or failed to perform all the duties incident to his employment with that degree of diligence, care, and attention which an ordi-

nary person would exercise under the same or similar circumstances. *Id.*; *McKnight*, 86 N.C. App. at 453, 358 S.E.2d at 109.

We believe that if no specific contractual terms existed and the question was solely one of whether Defendant failed to serve his employer faithfully and diligently or failed to perform his duties with the degree of care that an ordinary person would exercise under the same or similar circumstances, this ambiguity would require jury resolution as to the issue of whether just cause for termination existed. However, since the Employment Agreement explicitly defines specific grounds for termination, this is simply a question of law, which a court may answer because it involves a construction of a written contract whose terms are not ambiguous. *Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009) ("Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms.") (citation omitted). In the case at hand, we thus accept as a matter of law the definition of just cause provided in the Employment Agreement.

In support of his argument that a jury must find just cause as an issue of fact, Plaintiff erroneously relies on *Walker v. Goodson Farms, Inc.*, 90 N.C. App. 478, 369 S.E.2d 122 (1988). Plaintiff seems to argue that in *Walker* the jury defined just cause as an issue of fact because the jury determined whether the plaintiff's alcohol consumption interfered with his work. However, in *Walker* this Court defined just cause as a matter of law. *Id.* at 488, 369 S.E.2d at 127. The defendants urged this Court to "hold as a matter of law that habitual drinking of alcohol on an employer's premises during working hours constitutes 'just cause' for discharge." *Id.* The *Walker* Court rejected that proposition and instead held as a matter of law that an employee's use of alcohol constitutes just cause for termination of the employment contract "to the extent that it interfere[s] with the proper discharge of his duties." *Id.* (alteration in original) (quotation marks omitted) (quoting *Wilson*, 262 N.C. at 132, 136 S.E.2d at 577).

Although the *Walker* Court was clear that the determination of whether the employee engaged in the alleged conduct (using alcohol to the extent it interfered with his work) was a question of fact for the jury, it defined just cause as a matter of law. *Walker*, 90 N.C. App. at 482, 369 S.E.2d at 125. *Walker* thus comports with the two-part analysis of *Carroll* and *Sanders*. Because the second issue in *Walker*,

whether the plaintiff's alcohol consumption interfered with his work, was an issue of fact, the plaintiff was entitled to a jury trial. *Id.*

In the present case, because the parties' unambiguous language in the Employment Agreement states that grounds for termination include "any violation of policies and procedures listed in the [DSI] employee handbook," and the employee handbook includes "substandard performance on the job" as a ground for discharge, the trial court was justified in construing this language, as a matter law, to define just cause for termination. Plaintiff admits that his conduct was an "error" and hence "substandard"; his obfuscation of exculpatory evidence in the 12 May 2006 Report violated the protocol of his lab. This violation meets the specific language of the just cause provisions of Plaintiff's Employment Agreement, and we conclude this constitutes just cause for termination as a matter of law. Thus, there is no genuine issue of material fact as to whether just cause existed for Plaintiff's termination.

Plaintiff's next argument that the reasons for the discharge were pretextual is misplaced. Had Plaintiff continued his employment at DSI, he would have been entitled to a "milestone" payment in January 2008. Plaintiff claims Defendants terminated his employment to avoid this payment. On appeal, Plaintiff cites *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 618 S.E.2d 867 (2005) in support of his claim. However, in *Johnson*, there were material disputes of fact as to the alleged conduct of the employee that the employer cited as just cause for termination. *Id.* at 369-70, 618 S.E.2d at 870-71. In the present case, no such disputes exist, and DSI had just cause to terminate Plaintiff as a matter of law. Given this just cause for termination, we conclude DSI's reasons for Plaintiff's discharge were not pretextual.

Furthermore, equitable public policy reasons exist to support DSI's termination of Plaintiff. Related case law regarding at-will employment helps explain our position on this issue.

There are certain exceptions to the at-will employment rule, including public policy exceptions involving enforcement of statutes:

First . . . parties can remove the at-will presumption by specifying a definite period of employment contractually. Second, federal and state statutes have created exceptions prohibiting employers from discharging employees based on impermissible considerations such as the employee's age, race, sex, religion, national origin, or disability, or in retaliation for filing certain claims against

the employer. Finally, this Court has recognized a public-policy exception to the employment-at-will rule.

*Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997) (citations omitted). Among the earliest cases setting forth a public policy exception is *Sides v. Duke Univ.*, 74 N.C. App. 331, 328 S.E.2d 818 (1985), *overruled in part, Kurtzman*, 347 N.C. at 333, 493 S.E.2d at 423. In sum, *Sides* stands for the proposition that refusal to testify falsely or incompletely does not constitute just cause for termination, as a matter of public policy. We assert the inverse proposition, that providing false or incomplete testimony may constitute just cause for termination, as a matter of public policy.

In the present case, Plaintiff's misconduct involves intentionally obscuring evidence and submitting an incomplete report in a court of law when clear explanation of the test results would have exculpated individuals wrongly charged. We believe public policy supports the conclusion that such misconduct is grounds for just cause termination of employment.

Upon *de novo* review, we conclude Plaintiff's admissions of error establish that Plaintiff engaged in violations of lab protocol constituting just cause for his discharge by Defendants. We see no evidence adduced by Plaintiff to overcome this defense and therefore, under the applicable standard of review, we hold Defendants were entitled to summary judgment on this first issue.

### B. Tortious Interference

[2] Plaintiff also argues the trial court erred in granting Defendants' Motion for Summary Judgment regarding Plaintiff's claim for tortious interference with contract. We do not agree.

In a claim of tortious interference with contract, a plaintiff must establish:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Sellers v. Morton*, 191 N.C. App. 75, 81, 661 S.E.2d 915, 921 (2008) (citing *White v. Cross Sales & Eng'g Co.*, 177 N.C. App. 765, 768-69, 629 S.E.2d 898, 901 (2006)).

In the present case, Plaintiff alleges "1. A valid contract exist[ed] between [himself] and DSI; 2. Defendants Clark and AMI knew of the contract; 3. Clark and AMI intentionally induced DSI to breach its contract with [P]laintiff; 4. In doing so, Clark and AMI acted without legal justification; and 5. Plaintiff suffered damages."

We believe evidence supporting the third element of this tort is lacking from Plaintiff's claim. As we have discussed, DSI did not breach its contract with Plaintiff because it had just cause for termination. Since there was no breach of contract in this case, Plaintiff's claim fails. Additionally, given our determination that just cause for termination exists, Clark and AMI had legal justification for discharging Plaintiff.

Consequently, there are no genuine issues of material fact as to Plaintiff's claim of tortious interference with contract, and the trial court appropriately granted Defendants' Motion for Summary Judgment.

### C. North Carolina Wage and Hour Act, CPI Adjustments

[3] Plaintiff next argues that the trial court erred in granting Defendants' Motion for Summary Judgment and denying Plaintiff's Motion for Partial Summary Judgment regarding Plaintiff's North Carolina Wage and Hour Act claim. We agree with Plaintiff that there are material issues of fact that preclude summary judgment on this issue.

The relevant North Carolina statute provides that:

> Every employer shall pay every employee all wages and tips accruing to the employee on the regular payday. Pay periods may be daily, weekly, bi-weekly, semi-monthly, or monthly. Wages based upon bonuses, commissions, or other forms of calculation may be paid as infrequently as annually if prescribed in advance.

N.C. Gen. Stat. § 95-25.6 (2009). In the Employment Agreement, Plaintiff and DSI specified that "[t]he salary shall be adjusted annually to, at least, reflect any percentage increase in the Consumer Price Index (all items) as calculated by the United States Bureau of Labor Statistics." Defendants claim this provision is too vague to be enforceable, since the Employment Agreement does not specify which specific CPI the parties intended to use.

When determining the intent of contracting parties, we look first to the language of the agreement. *Jackson v. Jackson*, 169 N.C. App. 46, 54, 610 S.E.2d 731, 736-37 (Hunter, J., dissenting) (citations omitted), *rev'd for reasons stated in dissent*, 360 N.C. 56, 620 S.E.2d 862-63 (2005). If the contract's plain language is clear, the intention of the parties can be inferred from the contract's words. *Id.* In that case, interpreting "the intention of the parties is a question of law. If the contract is ambiguous, however, interpretation is a question of fact, and resort to extrinsic evidence is necessary." *Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd.,* ___ N.C. App. ___, ___, 707 S.E.2d 385, 391 (2011) (citations and quotation marks omitted).

In the present case, the language of the contract is ambiguous and genuine issues of material fact exist as to which iteration of the CPI should be used. The terms of the written contract and the fact that DSI sent Plaintiff a check for $6,554.24 convince us that Defendants had the ability to calculate the salary adjustment. We also find convincing Plaintiff's evidence, supported by expert testimony, that ambiguous provisions of the Employment Agreement regarding use of the CPI could be resolved by choosing a specific index. Because the CPI may have many different indices upon which to base salary adjustments, we conclude the parties are entitled to offer a formulation of the CPI they contend should be used to calculate Plaintiff's supplementary wage adjustments.

We thus vacate the trial court's Order granting Defendants' Motion for Summary Judgment on this claim and remand for a determination of the proper amount of salary due and whether additional costs and reasonable attorneys' fees are justified. *See* N.C. Gen. Stat. § 95-25.22(d) (2009) ("The court, in any action brought under [the Wage and Hour Act] may, in addition to any judgment awarded plaintiff, order costs and fees of the action and reasonable attorneys' fees to be paid by the defendant.")

### IV. Conclusion

We conclude the resolution of the issue of just cause makes unnecessary our resolution of Plaintiff's other arguments on appeal. We affirm the award of summary judgment on all claims, except Plaintiff's Wage and Hour Act claim, which we vacate and remand to the trial court for further action.

Affirmed in part, vacated and remanded in part.

Judges BRYANT and STROUD concur.